Nelson Bunker **HUNT** et al.,
**Plaintiffs-Appellants,**

v.

**MOBIL OIL CORPORATION** et al.,
**Defendants-Appellees.**

**No. 9, Docket 76–7052.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1976.

Decided Jan. 12, 1977.

Daniel P. Levitt, New York City (Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, Kenneth Berlin, New York City, Philip Hirschkop & Associates Ltd., Philip J. Hirschkop, Alexandria, Va., of counsel), for plaintiffs-appellants.

Edward F. Howrey, Washington, D.C. (Howrey & Simon, A. Duncan Whitaker, Harry E. Jennings, Jr., Mark D. Wegener, Washington, D.C., Richard H. Zahm, New York City, Juliet Shepard, Englewood, N.J., of counsel), for defendant Mobil Oil Corp.

Kaye, Scholer, Fierman, Hays & Handler, Milton J. Schubin, Texaco Inc., Charles F. Kazlauskas, Jr., G. Kenneth Handley, Lawrence R. Jerz, New York City, of counsel, for defendant Texaco, Inc.

Lord, Day & Lord, Gordon B. Spivack, John W. Castles, 3d, Harry G. Sklarsky, David H. Marks, Carolyn Ellis, New York City, Pillsbury, Madison & Sutro, Turner H. McBaine, Wallace L. Kaapcke, Thomas E. Haven, San Francisco, Cal., of counsel, for defendant Standard Oil Co. of Cal.

Shea, Gould, Climenko, Kramer & Casey, Bruce A. Hecker, Joseph Ferraro, New York City, of counsel, for British Petroleum Co., Ltd.

Sullivan & Cromwell, Robert MacCrate, Robert M. Osgood, Barbara A. Mentz, New York City, of counsel, for defendant Exxon Corp.

Before MULLIGAN and VAN GRAAFEILAND, Circuit Judges, and GAGLIARDI, District Judge.*

MULLIGAN, Circuit Judge:

This appeal raises the question whether the district court properly dismissed before trial, on the basis of the act of state doctrine, the third antitrust claim of the plaintiffs-appellants' complaint seeking treble

* Of the Southern District of New York, sitting by designation.

damages from the named defendants-appellees as the result of the nationalization of the plaintiffs' oil producing properties in the Sarir Field by the Libyan government on June 11, 1973. We hold that the motion to dismiss was correctly decided and affirm the judgment of the district court.

## I

Nelson Bunker Hunt filed a complaint on March 3, 1975 in the United States District Court for the Southern District of New York charging in the first three counts that the named defendants had unlawfully combined and conspired to the damage of the plaintiff in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and section 73 of the Wilson Tariff Act, 15 U.S.C. § 8. A fourth claim alleged damages arising from a breach of contract. The complaint was amended by stipulation on January 9, 1976 adding as plaintiffs W. Herbert Hunt and Lamar Hunt. Hereinafter the plaintiffs are referred to as "Hunt." The complaint on the basis of the antitrust claims alone seeks damages of not less that $125 million before trebling. Prior to filing its answers containing denials, affirmative defenses and counterclaims, certain of the defendants (Mobil Oil Corporation, Texaco, Inc., Standard Oil Company of California, The British Petroleum Company (B.P.), Exxon Corporation, Gulf Oil Corporation, Occidental Petroleum Corporation and Grace Petroleum Corporation) moved to dismiss the first, second and third claims for lack of subject matter jurisdiction and for failure to state claims upon which relief could be granted, pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure. These defendants also moved to dismiss the breach of contract claim on grounds not relevant to this appeal. In an opinion, reported at 410 F.Supp. 10, filed on November 5, 1975, United States District Judge Ed-

ward Weinfeld denied the motion to dismiss the first and second antitrust claims but granted the motion to dismiss the third antitrust claim. The disposition of the breach of contract claim in covered in the trial court's opinion but is not here pertinent.

Thereafter, on January 22, 1976, Judge Weinfeld granted Hunt's motion for a final judgment dismissing the third claim as to all the defendants pursuant to Fed.R.Civ.P. 54(b) upon the express condition that the appeal be prosecuted with dispatch. A final judgment dismissing the third claim as to all defendants was entered on February 4, 1975, thus permitting this otherwise interlocutory appeal by Hunt.

■ In granting the Rule 54(b) motion, Judge Weinfeld stated, *inter alia*, that if the motion were denied, and thereafter on appeal from any judgment entered with respect to the first two claims the dismissal of the third claim was reversed, a duplicative lengthy trial would be required creating additional but unnecessary expense to the parties. He further found that this appeal would not delay the prospective trial nor would it interfere with the discovery process. We agree that on these grounds the motion was properly decided. Therefore, we reject the defendants' argument that this determination constituted an abuse of discretion and consequently proceed to the merits of the appeal.

## II

Hunt is a non-integrated independent producer of oil which in 1957 obtained an oil concession in Libya. The seven major oil producers, who are included as defendants here, sometimes called "The Seven Sisters", are vertically integrated companies generally producing oil in both Libya and the Persian Gulf fields.[1] In November 1961, low sulphur oil was discovered in Libya at the

---

1. The seven major oil producer defendants are Mobil Oil Corporation, Exxon Corporation, Shell Petroleum Corporation, Ltd., Texaco, Inc., Standard Oil Company of California, The British Petroleum Company, Ltd. and Gulf Oil Corporation. They explore for, produce and refine crude oil, transport both crude oil and refined petroleum products and market refined petrole-

um products. The bulk of their crude oil production (about 90%) is in the Persian Gulf area (Saudi Arabia, Iran, Iraq, Kuwait, Abu Dhabi, Qatar, Dubai and Oman). Gulf has no Libyan production. Defendants Occidental, Gelsenberg and Grace are diversified companies producing crude oil in Libya.

Sarir Field, which eventually reached a level of 450,000 barrels a day shared equally by Hunt and B.P. which had a one-half undivided interest in the concession. In September 1969, Colonel Mu'ammar al-Qadhafi assumed power in Libya under a new government, the Revolutionary Command Council (RCC) which announced a policy of increasing the price of Libyan crude oil as well as the government's share or "take" in the price. The RCC's policy envisioned increased governmental control over production and production facilities. The heightened militancy of Libya resulted in agreements which were forced upon all the oil producers in Libya in September 1970, substantially increasing the take of the Libyan government in their profits. These agreements occasioned similar demands by the Persian Gulf countries which were members of the Organization of Petroleum Exporting Countries. That organization formulated a series of resolutions promulgated in December 1970 calling for more control by the producing nations over production. Despite the recently concluded agreements of Libya with its oil producers, the RCC demanded new increases in prices as well as taxes early in January 1971. The Libyan government first moved against Hunt and Occidental making certain unilateral "non-negotiable" demands which had to be accepted prior to January 16, 1971 and which were at variance with existing agreements with those oil producers.

In an effort to present a united front and fearful that the Libyan policy would escalate the demands of the producing nations in the Persian Gulf area, the seven majors met secretly in January 1971 in New York City to structure their resistance to the demands of the oil producing countries. In light of their concerted activity and the antitrust implications it presented, the major oil companies sought and obtained a clearance letter from the Department of Justice which indicated that it had no present intention of bringing any antitrust action on condition that the independent Libyan oil producers be included in any joint action proposed. The independent producers, including Hunt, were thereupon invited to participate in the meetings with the majors. These meetings culminated in the drafting of a so-called "sharing arrangement" known as the Libyan Producers Agreement of January 15, 1971 (the Agreement) which was supplemented and amended on October 18 and December 16, 1971 and November 21, 1972. The Agreement in general provided that if any party's crude oil production in Libya was cut back as the result of government action, all other producers would share in the cutback on a proportionate basis. It further provided that if there was insufficient Libyan oil to meet contractual obligations to existing European or Western Hemisphere customers due to restrictions or a government shutdown, the Persian Gulf producers would supply the Libyan producers with Persian Gulf oil at cost, with an option to pay cash in lieu of oil at a nominal sum per barrel. At that time Hunt had three such customers, all of whom were signatories to the Agreement and two of whom, Exxon and Shell, were among the seven majors. The Agreement as well as the subsequent amendments and supplements were reported to the antitrust division of the Department of Justice. Hunt was a party to the initial agreement and the subsequent modifications.

On December 7, 1971 the Libyan government nationalized B.P.'s half of the Sarir Field and demanded that Hunt market B.P.'s share of the Sarir production for Libya's account. Appellants allege that in response to the requests and assurances of B.P. and the other majors and in reliance upon the Agreement, Hunt refused the Libyan demand. As a result Libya evicted Hunt personnel from Sarir in early 1972 and cut back Hunt's permissible oil production by 50%. Hunt and B.P. as a consequence of these events received crude oil from the other parties to the Agreement. In October 1972, the Libyan government demanded an immediate 50% equity participation in Hunt's interests in Sarir. Hunt

again rejected the Libyan demands. Hunt alleges that as a result of his non-cooperation with the Libyan demands, the Libyan government on December 11, 1972 refused to permit further export of Hunt's oil. On May 24, 1973 Libya terminated his right to produce and export crude oil and on June 11, 1973 pursuant to Law 42 of 1973 it nationalized all of Hunt's assets.

## III

The sole issue on this appeal is whether the district court erred in dismissing the third antitrust claim of Hunt which is set forth in the margin.[2] The gravamen of this claim is that the seven majors combined and conspired in violation of the Sherman and Wilson Tariff Acts to preserve the competitive advantage of Persian Gulf crude oil over that of Libyan crude oil and to diminish competition from Libyan crude oil producers. The mechanism employed is alleged to be the Agreement which precluded Hunt from reaching any settlement with Libya inconsistent with the competitive advantage of the defendants and through which the defendants manipulated Hunt's dealings with Libya to the extent that Hunt was eventually nationalized, suffering substantial loss of profits as well as other unspecified damage.

Hunt's complaint does not name Libya as a defendant or in any way suggest that it is a co-conspirator of the named defendants. Nonetheless Judge Weinfeld reasoned that the combination or conspiracy charged did not of itself cause the damage complained of but rather that the damage resulted from the action of Libya in cutting back Hunt's production, shutting off its oil and finally nationalizing its properties. Thus he found that Hunt would be required to establish that *but for* the conspiracy Libya would not have committed any of these aggressive actions. This he decided would require judicial inquiry into "acts and conduct of Libyan officials, Libyan affairs and Libyan policies with respect to plaintiff's as well as other oil producers' properties and the underlying reasons for the Libyan government's actions." 410 F.Supp. at 24. He concluded that this inquiry was foreclosed under the act of state doctrine.

## IV

The appellants have vigorously attacked the application of the act of state doctrine to the facts pleaded in its third claim. Whatever great expectations appellants may have anticipated from the Supreme Court's decision in *Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), which was decided after the decision below was rendered, have been blighted. *Dunhill* reaf-

2. THIRD CLAIM

61. Plaintiff Hunt realleges each and every allegation contained in paragraphs 1 through 45.

62. Since at least 1970, the seven majors along with co-conspirators named and not named, have engaged in a combination and/or conspiracy in unreasonable restraint of the foreign trade and commerce of the United States, in violation of the Sherman Act, 15 U.S.C. § 1, and of Section 73 of the Wilson Tariff Act, 15 U.S.C. § 8.

63. As part of the unlawful conduct complained of, the seven majors have combined and conspired among themselves to preserve the competitive advantage of Persian Gulf crude oil relative to that of Libyan crude oil, and to diminish competition from Libyan crude oil producers. To these ends they have combined and conspired to prevent plaintiff Hunt and other Libyan producers from reaching any agreement with the Libyan government incon-

sistent with that competitive advantage, even where they knew that the necessary and foreseeable consequence of their conduct would be Hunt's elimination as a Libyan crude oil producer.

64. In furtherance of this unlawful combination and conspiracy, the seven majors entered into written agreements with Hunt and other Libyan producers, manipulated the course of Libyan negotiations so as to advance their own interests in the Persian Gulf, and followed a course of action that led to Hunt's nationalization and elimination from the production of Libyan crude oil.

65. By reason of this unlawful combination and conspiracy, Hunt has been and will continue to be injured in his business and property. He has sustained damages, the full extent of which cannot presently be calculated, but which include lost profits on his half interest in the 11 billion barrels of crude oil contained in the Sarir Field.

firmed the doctrine in traditional terms, announcing that it " 'precludes the courts of this country from inquiring into the validity of the *public* acts a recognized foreign sovereign power committed within its own territory.' *Banco Nacional de Cuba v. Sabbatino* [376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804] . . . and that it applies to 'acts done within their own states, in the exercise of *governmental* authority.' *Underhill v. Hernandez* [168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456]. . . . " Id. at 1867. The majority opinion of Mr. Justice White in *Dunhill* underscored "public" and "governmental" since the act complained of there, the failure of Cuba to return to petitioner Dunhill certain funds paid to a Cuban government-controlled corporation for cigars sold to Dunhill by this Cuban cigar business before government seizure, was found to be an act of the sovereign committed in the course of a purely commercial operation.[3] *Dunhill* declined to extend the act of state doctrine to situations where the sovereign has descended to the level of an entrepreneur. Appellants conceded on the oral argument of this appeal that the nationalization of Hunt's properties was not a purely commercial act within the *Dunhill* exception. Expropriations of the property of an alien within the boundaries of the sovereign state are traditionally considered to be public acts of the sovereign removed from judicial scrutiny by application of the act of state rubric. Indeed such action as that taken here by Libya is cited in *Dunhill* as an example of non-commercial sovereign activity within the ambit of the doctrine. See 425 U.S. at 704, 96 S.Ct. at 1866.

Any possible doubt about this issue is in any event removed since upon the seizure of Hunt's property on June 11, 1973 President al-Qadhafi announced "[W]e proclaim loudly that this United States needs to be given a big hard blow in the Arab area on its cold, insolent face. . . . The time has come for the Arab peoples to confront the United States, the time has come for the U.S. interests to be threatened earnestly and seriously in the Arab area, regardless of the cost."[4] The note of the United States to the Libyan government on July 8, 1973 in response both to the seizure and the public statements of Libya concerning it, characterized the expropriation as "political reprisal against the United States Government and coercion against the economic interests of certain other U.S. nationals in Libya."[5] We conclude that the political act complained of here was clearly within the act of state doctrine and that since the disputed pleadings inevitably call for a judgment on the sovereign acts of Libya the claim is non-justiciable.

## V

In finding the doctrine applicable to the pleadings in issue Judge Weinfeld placed principal reliance upon *American Banana v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), a decision dubbed by appellants as an artifact and museum piece of no precedential value. In *American Banana* the plaintiff sued for treble damages under the Sherman Act alleging that his banana plantation had been seized and his business destroyed by the confiscatory acts of the Costa Rican government, which had acted at the defendant's instigation in furtherance of his anti-competitive behavior. The Supreme Court, in an opinion authored by Mr. Justice Holmes, held, in reliance on

3. The dissenting opinion of Mr. Justice Marshall with whom Justices Brennan, Stewart and Blackmun joined would have held the acts complained of within the proscription of the act of state doctrine. 96 S.Ct. at 1871.

4. Statement of the State Department, Hearings before the Subcomm. on Multinational Corporations of the Senate Comm. on Foreign Relations, 93rd Cong., 2d Sess., pt. 6, at 316–17 (1974). The commentary that accompanied Libya's Law 42 of 1973 that effectuated the seizure described the act as "a warning to the

United States to end its recklessness and hostility to the Arab nation." It further stated that, "In view of . . . American impudence and the continued disregard for Arab rights and destinies, it was necessary to strike a blow against U.S. policy. . . ." A. Rovine, Digest of United States Practice in International Law 1973 at 334.

5. A. Rovine, Digest of United States Practice in International Law 1973 at 335.

*Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), that since the seized plantation was within the de facto jurisdiction of Costa Rica, its seizure by that state was an act of sovereign power which could not be litigated in our courts. The opinion further held that since the acts complained of occurred outside of the United States they were beyond the jurisdictional scope of the Sherman Act.[6]

 There can be no question that as to this latter facet of the opinion, the extraterritorial sweep of the Sherman Act, *American Banana* is no longer a viable precedent. This aspect of the case has been explicitly rejected by later Supreme Court cases which hold that, "A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 704, 82 S.Ct. 1404, 1413, 8 L.Ed.2d 777 (1962); *United States v. Sisal Sales Corp.,* 274 U.S. 268, 276, 47 S.Ct. 592, 71 L.Ed. 1042 (1927). Hence, we agree with appellants that the Sherman Act is applicable to the cause pleaded in the third claim. However, the fact that the court has jurisdiction does not make the issue justiciable. *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 773–74, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (Powell, J., concurring). Were the Sherman Act not applicable here we would never reach the act of state doctrine which is a manifestation of judicial abstention.

Appellants argue that both *Sisal* and *Continental Ore, supra,* overturned *American Banana's* application of the act of state doctrine. Not so. *American Banana* on this point rested on *Underhill v. Hernandez, supra,* and the classical definition of the act of state doctrine there was reiterated much later in both *Banco Nacional de Cuba v.*

*Sabbatino,* 376 U.S. 398, 416, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) and *Alfred Dunhill of London v. Republic of Cuba, supra,* 96 S.Ct. at 1859 n.7, so that it can hardly be consigned to the oblivion that appellants consider it richly deserves.

In *Sisal* the antitrust complaint alleged a conspiracy among American bankers and corporations dealing in sisal, a plant fiber used to make twine, and a Mexican corporation which purchased that product from local producers in the Yucatan, the major source of sisal. The Mexican company became the sole purchaser of sisal and laws were solicited and enacted in both Mexico and the Yucatan which allegedly gave it advantages over all other competitors. One of the American companies then became the exclusive selling agent of the Mexican corporation in all the world markets thus permitting the defendants to acquire complete dominion over the market obtaining the power to fix prices and eliminate competition, the classic hallmarks of the section 2 violation. Mr. Justice McReynolds' opinion distinguishes *American Banana* on the Sherman Act issue, pointing out that the act of seizure committed there was performed in Costa Rica while in *Sisal* the conspiracy took place in the United States and was made effective by acts performed here. Although the act of state doctrine was raised by one of the appellees (represented by a certain Harold R. Medina) the Court makes no specific mention of the doctrine. Although it cites *American Banana's* proposition that a "seizure by a state is not a thing that can be complained of elsewhere in the courts", it found that circumstances in *Sisal* were "radically different" from those in *American Banana* even though the conspirators were "aided by discriminatory legislation." 274 U.S. at 276, 47 S.Ct. 592. While Mr. Justice McReynolds characterized the plaintiff's pleading in *Sisal* as "confused, difficult to follow and

---

**6.** Appellants argue that Mr. Justice Holmes had a uniquely narrow view of the Sherman Act. His disaffection for that legislation needs little documentation. E. g., Letter from Justice Holmes to Harold J. Laski, March 4, 1920, in 1 Holmes-Laski Letters 248–49 (1953 ed. M.

Howe). However, the comment is not really germane. The unanimous opinion of the Court is hardly suspect because of the possible animus of its author. In any event, as we shall develop, the antitrust and act of state elements of the decision are distinct.

as an excellent example of bad pleading" the opinion itself is hardly as clear as a mountain lake in springtime. It is clear however that it does not purport to overrule *American Banana's* act of state holding and that it considered the assistance of the sovereign through the mechanism of favorable legislation engineered by the defendants to be of considerably less moment than the expropriation by the state of the plaintiff's properties in the earlier case.[7] In any event, we deem it to be of no value to the appellants except on the jurisdictional thrust of the Sherman Act which, as we have pointed out, has been confirmed by later cases and is not disputed here.

*Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* we find to be of no assistance to the appellants on the act of state issue. The antitrust violation there asserted involved two American corporations and several subsidiaries (including a Canadian subsidiary) of one of these corporations which had succeeded in monopolizing 99% of the vanadium market in the United States. The Canadian defendant, Electro Met of Canada, was an agent of the Canadian government and, while such, excluded the plaintiff Continental from the Canadian market, dividing its former share between two of the defendants. The Court found:

> [T]here is no indication that the [Metals] Controller or any other official within the structure of the Canadian Government approved or would have approved of joint efforts to monopolize the production and sale of vanadium or directed that purchases from Continental be stopped.

. . . Respondents are afforded no defense from the fact that Electro Met of Canada in carrying out the bare act of purchasing vanadium from respondents rather than Continental, was acting in a manner permitted by Canadian law. There is nothing to indicate that such law in any way compelled discriminatory purchasing, and it is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme.

*Id.*, 370 U.S. at 706–07, 82 S.Ct. at 1414. Since no act of the sovereign was involved in *Continental Ore* there is nothing in that case to disturb *American Banana's* holding on the act of state doctrine. It is simply not the law that merely because the action is based on the antitrust laws, the act of state doctrine is to be discarded.[8]

## VI

The appellants contend that the act of state doctrine cannot be applicable here because Libya is not named as a defendant, is not designated as a co-conspirator and in fact "was as much a victim of the conspiracy as was Hunt." Hence appellants inform us that we are not called upon here to sit in judgment upon the acts of Libya. Thus they argue that the third count of their complaint is not within any of the cases which have applied the doctrine. A similar argument was raised in *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92 (C.D. Cal. 1971), aff'd per curiam, 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 950, 221 S.Ct. 272, 34 L.Ed.2d 221 (1972) relied upon by Judge Weinfeld

7. Most commentators have also concluded that *American Banana's* precedential value on the act of state doctrine was undiminished by *Sisal* or any other case cited for that proposition by appellants. E. g., A.B.A., Antitrust Developments 365 (1975); K. Brewster, Antitrust and American Business Abroad 97 (1958); W. Fugate, Foreign Commerce and the Antitrust Laws § 2.21 (1973).

8. Appellants also contend that *American Banana* is inapplicable because Hunt relies on not only the Sherman Act but also the Wilson Tariff Act which "was not in existence when *American Banana* was decided." Since the antitrust provision of the Wilson Tariff Act was initially enacted in 1894, Act of Aug. 27, 1894, c. 349, § 73, 28 Stat. 570, in substantially the same language as appears presently, 15 U.S.C. § 8, the argument is fallacious. In any event, this argument only relates to jurisdiction and does not affect the act of state issue. In so far as the substantive antitrust provisions of the Wilson Tariff Act are concerned, they follow the same pattern as the Sherman Act. *United States v. Cooper Corp.*, 312 U.S. 600, 608, 61 S.Ct. 742, 85 L.Ed. 1071 (1941); see W. Fugate, Foreign Commerce and the Antitrust Laws § 13.2 (2d ed. 1973).

below as a case which involved facts substantially parallel to those in the instant case. 410 F.Supp. at 24. *Occidental* involved an alleged antitrust conspiracy to restrain and monopolize the exploration, development and exploitation of petroleum reserves in the territorial waters of the Trucial States. The defendants were accused, *inter alia*, of having procured and induced the Ruler of Sharjah for his personal gain to assert dominion over certain territory within a concession area awarded to the plaintiffs by another Trucial State, Umm al Qaywayn. The plaintiffs in that case raised the same argument raised here—that they were complaining not of the acts of a foreign state but only of those of the named defendants in catalyzing them. However, the court indicated that the plaintiffs had characterized the foreign sovereigns there involved as co-conspirators, an appellation studiously avoided in the case before us. Moreover, in that case the plaintiffs would have been required to establish that Sharjah had issued a fraudulent territorial waters decree. 331 F.Supp. at 110. Here it is urged that Hunt makes no claim that Libya acted illegally at all, simply that as a matter of fact its "lawful" act was induced by the unlawful conduct of the named defendants.[9] While we agree that these points serve to distinguish *Occidental* from the case before us, the distinctions proffered are of no substance and do not affect the disposition of this case.

 First: The excision of the government of Libya from the pleadings as a

defendant or co-conspirator does not eliminate its action as a necessary element in the cause pleaded in the third claim. Hunt has pleaded that he was damaged as the result of Libyan action in cutting back his production and eventually nationalizing his properties.[10] It is well established that a private plaintiff who seeks damages in an antitrust action must allege and establish that his business or property was injured as a direct result of the Sherman Act violation. *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Salerno v. American League of Professional Baseball Clubs,* 429 F.2d 1003, 1004 (2d Cir. 1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971).

Appellants do not deny, as they cannot, this proposition of law. Instead, they argue that while Hunt must prove a causal connection between Libya's nationalization and the conspiracy charged this has been sufficiently pleaded and somehow this shields the third claim from dismissal prior to trial.[11] However, appellants admit that antitrust liability cannot be attributed to the defendants unless Hunt can prove that *but for* their combination or conspiracy Libya would not have moved against it. Since this nexus is at the heart of the claim we do not understand how Judge Weinfeld could have erred in anticipating that the doctrine of act of state was inescapably raised by the pleadings and thus was a major issue appropriately considered on the motion to dismiss.

---

**9.** *Occidental* in fact supports the holding below and the discussion here on the vitality of *American Banana.* Thus the court, while recognizing that the restrictive view of Mr. Justice Holmes in *American Banana* as to the territorial reach of the Sherman Act has not survived subsequent Supreme Court holdings, found that the act of state holding there applied has endured unscathed. 331 F.Supp. at 109–10.

**10.** ¶¶ 34, 40, 41 of the complaint.

**11.** Appellants urge on appeal that the interpretation of the third claim below was unduly narrow since ¶ 63 of the complaint, *supra*, note 2, also charged that the defendants conspired to preserve the competitive advantage of Persian Gulf crude oil over that of Libyan and thus

to diminish competition by preventing Hunt from reaching any agreement with the Libyan government inconsistent with that advantage. However, Hunt's first claim which alleges a conspiracy among the defendants in violation of both the Sherman and Wilson Tariff Acts states in ¶ 50(b) of the complaint that the major producers took steps to restrain competition by, "Negotiation and administration of the Libyan Producers' Agreement so as to disadvantage Libyan oil relative to Persian Gulf oil." That claim was not dismissed and Hunt is therefore not precluded from raising the issue at trial. Judge Weinfeld specifically found the act of state doctrine unavailable to the defendants on this count. 410 F.Supp. at 20–21.

Second: Appellants' argument that by their not challenging the propriety of Libya's action and by not asserting that Libya violated either international law or America antitrust law, the judicial branch of government is not required to sit in judgment of the act of the foreign sovereign is, upon analysis, superficial and not legally sufficient. It is true that traditional and textbook definitions of the act of state doctrine provide that courts in the United States are precluded from inquiring into the validity of the public acts of the foreign sovereign committed in its own territory. E. g., *Alfred Dunhill of London v. Republic of Cuba, supra,* 96 S.Ct. at 1863; *Frazier v. Foreign Bondholders Protective Council,* 283 App.Div. 44, 125 N.Y.S.2d 900, 903 (1st Dept. 1953); W. Fugate, Foreign Commerce and the Antitrust Laws § 2.21 at 81–82 (2d ed. 1973). However, while the skilled pleader here has meticulously attempted to avoid the issue of validity, its claim is admittedly not viable unless the judicial branch examines the motivation of the Libyan action and that inevitably involves its validity. Thus the State Department note of July 8, 1973 in response to the Libyan seizure of Hunt's properties after determining that the reasons for Libya's action were political reprisal against the United States government and economic coercion against other U.S. nationals in Libya concluded:

Under established principles of international law, measures taken against the rights and property of foreign nationals which are arbitrary, discriminatory, or based on considerations of political reprisal and economic coercion are invalid and not entitled to recognition by other states.

A. Rovine, Digest of United States Practice in International Law 1973 at 335.

In sum, the United States has officially characterized the motivation of the Libyan government, the very issue which Hunt now seeks to adjudicate here. The attempted transmogrification of Libya from lion to lamb undertaken here does not succeed in evading the act of state doctrine because we cannot logically separate Libya's motivation from the validity of its seizure. The American judiciary is being asked to make inquiry into the subtle and delicate issue of the policy of a foreign sovereign, a Serbonian Bog, precluded by the act of state doctrine as well as the realities of the fact finding competence of the court in an issue of far reaching national concern.

Mr. Justice Harlan, in analyzing the act of state doctrine in *Banco Nacional de Cuba v. Sabbatino, supra,* 376 U.S. at 423, 84 S.Ct. at 938, observed:

It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

The *Dunhill* majority has reiterated this view:

The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations.

*Alfred Dunhill of London v. Republic of Cuba, supra,* 96 S.Ct. at 1863.

The act of state rubric then is perceived by the Supreme Court as a judicial articulation of the separation of powers doctrine and its application here is particularly appropriate since the executive branch has already determined the validity of the very act *sub judice* and has necessarily identified its motivation. Another inquiry could only be fissiparous, hindering or embarrassing the conduct of foreign relations which is the very reason underlying the policy of judicial abstention expressed in the doctrine in is-

sue.[12] Even if the Department of State had not spoken, the inquiry required by the third claim in this private litigation is hardly within the fact finding competence of the judicial branch.[13] Appellants claim that but for the conspiracy pleaded, Hunt's business would have continued to thrive and its properties would have remained unscathed and intact. This necessarily would require a wholesale examination of Libyan policy— how did it treat other companies, what provoked its "displeasure," how far could concessions by Hunt appease President al-Qadhafi.[14] The action taken here is obviously only an isolated act in a continuing and broadened confrontation between the East and West in an oil crisis which has implications and complications far transcending those suggested by appellants. To dismiss this examination as an issue of fact and not of law and therefore beyond the ambit of the act of state doctrine is, in our view, neither conceptually nor pragmatically sound.

## VII

Appellants urge finally, and perhaps ineluctably, that if the act of state doctrine as traditionally applied by the courts is found here applicable, it be redefined so that it would solely be utilized where a determination of the legality of the foreign sovereign's action is the issue. As we have already discussed, the issue of legality cannot be isolated from the issue of motivation of the foreign sovereign. Appellants here have recognized and, indeed, cited the State Department position on the seizure of Hunt's properties. Counsel has argued that a reversal of *Sabbatino* by *Dunhill,* which at the time of the briefing of this appeal was pending before the Supreme Court, would enable this court to examine the Libyan nationalization "uninhibited by the act of

12. The importance of a unified national voice on foreign policy has been recognized since the founding of the republic. See The Federalist No. 42 (J. Madison). The judiciary, even when it has had jurisdiction, has traditionally been reluctant to infringe on the executive's authority in the area of foreign affairs. This has resulted in the application of the political question doctrine to find such issues non-justiciable. See *Baker v. Carr,* 369 U.S. 186, 211–13, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

13. See *Holtzman v. Schlesinger,* 484 F.2d 1307, 1310–11 (2d Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974), and *Mitchell v. Laird,* 159 U.S.App.D.C. 344, 488 F.2d 611, 616 (1973), which emphasize the difficulty of a judicial tribunal in making determinations of political and diplomatic dimensions in the arena of foreign affairs, an area entrusted to the discretion of the President and the Department of State.

14. Our dissenting brother parts company with us when we say that in order to prove their damages, plaintiffs will be required to establish the motivation for the Libyan expropriation and that this inevitably involves its validity. He further argues that Libya is shielded from antitrust liability. We agree that Libya cannot be guilty of a Sherman Act violation. This is certainly so here since it is not a party and, in any event, it could not be because it is not a person or corporation within the terms of the Act but a sovereign state. *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,* 307 F.Supp. 1291, 1298 (D.Del.1970); Fugate, Antitrust Jurisdiction and Foreign Sovereignty, 49 Va.L.Rev. 925, 932 (1962); K. Brewster, Antitrust and American Business Abroad 94 (1958). (There is no claim here that Libya was performing a purely commercial act.) When we have discussed the "validity" of the act of confiscation we are not using the term in an antitrust sense but rather in an international law context. The plaintiffs admittedly can only succeed if they establish the motivation of Libya in making the seizure. The United States has characterized it as an act of political reprisal. We are now asked to determine that Libya would not have so acted had it not been for the conspiracy of the defendants. As recently indicated in *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir. 1976), "We wish to avoid 'passing on the validity' of foreign acts. *Sabbatino,* 376 U.S. at 423[, 84 S.Ct. 923]. Similarly, we do not wish to challenge the sovereignty of another nation, the wisdom of its policy, or the integrity and motivation of its action." See The Restatement, Second, Foreign Relations Law of the United States, § 41 (1965), "[A] court in the United States . . . will refrain from examining the validity of an act of a foreign state by which that state has exercised its jurisdiction to give effect to its public interests."

The dissent also urges that Libya's authorization, approval, encouragement or participation in restrictive private conduct confers no antitrust immunity on the wrongdoer. But this is not a case of Libyan participation in antitrust wrongdoing. The complaint is rather that Libya like Hunt was a "victim" of the conspiracy.

state doctrine." Appellants' reply brief at 16. But *Dunhill* has since been decided, Hunt is not within its purely commercial exception and *Sabbatino* remains unblemished, relied on and cited by both the majority and dissenting opinions. *Alfred Dunhill of London v. Republic of Cuba, supra,* 96 S.Ct. at 1866–67; id. at 1878 (Marshall, *J.,* dissenting).

In *Banco Nacional de Cuba v. Sabbatino, supra,* 376 U.S. at 428, 84 S.Ct. 923, Mr. Justice Harlan demurred from establishing any inflexible or all-encompassing rule in ° act of state cases. A fortiori it is not for this inferior court to undertake the task. This is particularly so since our holding is compelled by the separation of powers underpinning of the doctrine. Furthermore, the distinction sought to be engrafted would, in effect, result not in the doctrine's redefinition but its extirpation, thus stripping the judiciary of an invaluable tool needed on occasion to ease the friction between the departments.

Appellants emphasize that the court below noted both in its decision on the pleadings and its certification of this appeal that the recent disclosures of bribes and payoffs by multi-national corporations to foreign officials warrant consideration in the public interest of the continued viability of the act of state doctrine. While we have already found that there was no abuse in the certification here on the grounds we have mentioned, *supra,* part I, we respectfully disagree with the proposition that "scandalous payoffs" to foreign potentates or their janizaries provide any basis at all for reconsideration of the doctrine in this case. There is no allegation express or implied here that representatives of Libya were seduced or enticed in any manner by the payment of bribes or boodle to take the action complained about. On the contrary, as we have stated, Libya is depicted as the innocent dupe of a domestic conspiracy. This appeal therefore is not the proper vehicle for consideration of international commercial bribery in so far as it affects the act of state doctrine.

For all these reasons we affirm the dismissal of the third claim of the complaint.

VAN GRAAFEILAND, Circuit Judge, dissenting:

While I am far from convinced that plaintiffs, given the opportunity, would have been able to establish the cause of action which was. dismissed, the possible precedential impact of the majority's opinion prompts me to briefly record my dissent.

The "classic" definition of the act of state doctrine, reiterated by the Supreme Court in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 416, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) and *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 763, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), is found in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), where the court said:

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

Despite the broad language of this accepted definition, the doctrine does not purport to set up a jurisdictional bar to judicial review. *Ricaud v. American Metal Co.,* 246 U.S. 304, 309, 38 S.Ct. 312, 62 L.Ed. 733 (1918). Neither does it prohibit judicial scrutiny of the conduct of foreign officials. Indeed, the very assertion of an act of state defense requires the court to examine into the nature of the conduct complained of and its relationship to the foreign sovereign. *See Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Banco de Espana v. Federal Reserve Bank,* 114 F.2d 438 (2d Cir. 1940). Federal courts have not hesitated to receive evidence concerning the acts of foreign officials and the role played by American citizens in motivating such

acts. *See, e. g., United States v. Lira*, 515 F.2d 68 (2d Cir.), *cert. denied*, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975); *United States v. Cotten*, 471 F.2d 744, 746 n.4 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *Stonehill v. United States*, 405 F.2d 738 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). The proscription of the doctrine is against judicial determination of the validity of the acts of a foreign sovereign, *Alfred Dunhill of London, Inc. v. Republic of Cuba, supra*, 425 U.S. at 697, 706, 96 S.Ct. 1854; *Banco Nacional de Cuba v. Sabbatino, supra*, 376 U.S. at 428, 84 S.Ct. 923, and judicial redress of grievances predicated upon a finding of invalidity. *Underhill v. Hernandez, supra*, 168 U.S. at 252, 18 S.Ct. 83.

It is difficult to anticipate what plaintiffs' proof would have been in this case, because the district court dismissed their cause of action, under Fed.R.Civ.P. 12(b)(1), for failure to state a claim on which relief could be granted. However, plaintiffs' contention appears to be that the Libyan Producers' Agreement was used by the defendants to impose competitive disadvantages upon the independent oil producers and to prevent them from reaching an agreement with Libya which would have been adverse to the defendants' Persian Gulf interests. Plaintiffs argue that they were induced thereby to reject Libyan demands in order that defendants could negotiate more favorable terms for their Persian Gulf wells and that, because of defendants' illegal conduct, they were caused to take a position in their own dealings with Libya which resulted in the nationalization of their interests.

Although plaintiffs make no claim of wrongdoing upon the part of the Libyan government in effecting the expropriation of their property, my brothers reject this concession to Libyan sensibilities. They say that, in order to prove damages, plaintiffs will be required to establish the motivation for the Libyan expropriation and that this inevitably involves its validity. It is at this point that my brothers and I part company.

In *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 592, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Supreme Court made it clear that "state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity" upon the wrongdoer. The Court's citation of *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) indicates that this rule applies in both foreign and domestic states.[1] At the same time, the state itself is guilty of no wrongdoing under the Sherman Act because of the role which it plays. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

In the instant case, as Judge Mulligan correctly observes, plaintiffs have the burden of establishing causal relation between the private violations alleged and the injuries suffered. *Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003 (2d Cir. 1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971).[2] However, under the teaching of *Cantor* and *Parker, supra*, plaintiffs' success in this effort does not entail a finding that the acts of the Libyan government were invalid.

In *Continental Ore Co. v. Union Carbide & Carbon Corp., supra*, 370 U.S. at 704, 82 S.Ct. at 1412, the Court rejected as erroneous the Court of Appeals' holding that "such efforts as appellants claim defendants took to persuade and influence the Canadian Government" were not within the purview of the Sherman Act. The Court

---

1. The Court's reference to *Continental* as an example of state "participation" indicates that it reads its decision in *Continental* differently than do my brothers, who find no act of the sovereign to have been involved in that case.

2. In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969) the Court said:

It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4.

said that appellants' offer of proof on this issue "presented an issue for the jury's resolution as to whether the loss of Continental's Canadian business was occasioned by respondents' activities." *Id.* at 706, 82 S.Ct. at 1414.

The defendants in *Continental,* as in the instant case, relied upon *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909) to shield them from liability. Referring to *American Banana,* the Court said, 370 U.S. at 704, 82 S.Ct. at 1413:

> This Court there held that an antitrust plaintiff could not collect damages from a defendant who had allegedly influenced a foreign government to seize plaintiff's properties. But in the light of later cases in this Court respondent's reliance upon *American Banana* is misplaced.

I find appellees' reliance upon *American Banana* here to be equally misplaced. If the validity of the conduct of a foreign government is not placed in issue, its participation in the wrongdoing of individual defendants should not be permitted to screen the latter from accountability for their illegal acts.[3]

Domestic corporations play a variety of roles in the affairs of foreign nations, some of which may be forbidden under our laws. Where, as here, the wrong complained of is the role played rather than the possible political reaction thereto, I think it wrong to predicate an act of state defense upon the face of the pleadings. A complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

I would reverse the order dismissing the third claim of the complaint.

3. In *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92 (C.D.Cal.1971), *aff'd per curiam,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972), relied upon by the majority, the complaint alleged that the ruler of Sharjah, at the instigation of defendants, falsely asserted a claim to certain off-shore drilling areas not within its territorial waters. Since plaintiffs' claim was premised upon this assertion of wrongdoing and called into question the location of Sharjah's territorial boundaries, I find this case clearly distinguishable from the one before us.