**COMPANIA DE GAS DE NUEVO LARE-
DO, S. A., Plaintiff-Appellant,**

v.

**ENTEX, INC., Defendant-Appellee.**

**No. 81–2176.**

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1982.

Rehearing Denied Oct. 21, 1982.

C. M. Zaffirini, Laredo, Tex., for plaintiff-appellant.

Raymond J. Goodman, Laredo, Tex., Walter E. Workman, Hebert Gentry, Houston, Tex., for defendant-appellee.

Before THORNBERRY, REAVLEY and GARWOOD, Circuit Judges.

THORNBERRY, Circuit Judge:

## I. INTRODUCTION

This is a diversity action relating to a tort claim and a contractual dispute under the Texas Business and Commerce Code, section 2.302, between Compania de Gas de Nuevo Laredo, S.A. ("CGNL") and Entex, Inc. ("Entex"). The district court dismissed the tort claim, which alleged that Entex conspired with the Mexican government to unlawfully take control of CGNL assets in Mexico, on the basis of the act of state doctrine. The district court also found CGNL liable on its contract dispute in the amount of $1,235,658.88 plus attorney's fees. We affirm.

## II. FACTS AND DISPOSITION BELOW

At the time the suit arose, CGNL was a privately owned company organized under the laws of Mexico, and was engaged in supplying gas to the City of Nuevo Laredo in the Republic of Mexico. Entex, an American natural gas distributing company operating mainly in intrastate commerce in Texas, Louisiana, and Mississippi, had a

long-standing contract to export gas to CGNL. CGNL and Entex's predecessor, United Gas Corporation, entered into a contract on May 26, 1944. By order of the Federal Power Commission ("Commission")[1] under section 3 of the Natural Gas Act, 15 U.S.C. § 717b (1976), Entex's predecessor was authorized to export gas to CGNL "in accordance with the terms and provisions" of the 1944 contract, and upon the "terms and conditions" of the order itself. United Gas Corp., 4 F.P.C. 840, 841 (1945). The contract was subsequently assigned by United Gas Corporation to United Gas, Inc., which later changed its name to Entex, Inc.

The parties (or their predecessors) amended the contract on numerous occasions.[2] As amended, section VII of the contract, which governed the rate to be paid for the gas sold under the terms of the contract, called for a "base rate."[3] Any increase or decrease in the base rate was to become effective sixty days after the seller advised the buyer to that effect in writing. The buyer had the right, after February 1, 1973, to terminate the contract by written notice to seller not less than thirty days prior to the date the increase was to take effect. The seller also had the right to suspend deliveries of gas upon a breach by giving the buyer a similar notice in writing.

A 1968 amendment included "pass through" provisions which allowed the seller to adjust the base rate upward or downward to reflect, inter alia, the cost of its gas purchases. These pass through adjustments were included in the fixed rate automatically, and did not require the sixty days written notice for a rate increase or decrease. CGNL accepted this amendment without objection, and at no time prior to the suit challenged its validity or legality.

In 1973, the Texas Railroad Commission, in Docket 500, voided Entex's contracts with its supplier, the Lo-Vaca Gathering Company ("Lo-Vaca"), and substituted a price formula substantially raising the cost of gas to all of Lo-Vaca's customers, including Entex. Entex in turn "passed through" these increases to CGNL, resulting in a substantial rise in the cost of gas to CGNL. CGNL became delinquent in its account with Entex beginning in 1974, apparently because it could not pass through all of these rate increases to its customers. By 1976, the arrearage had become significant, and Entex sent a letter to CGNL and to various officials of the Mexican government on the federal and state levels informing them that, unless the account was paid for, Entex intended to suspend deliveries in accordance with the terms of its contract.

On the day before Entex was to suspend service, CGNL filed suit in the United States District Court for the Southern District of Texas to enjoin Entex from suspending gas deliveries. Although the court refused to issue a preliminary injunction, it temporarily restrained Entex from discontinuing its gas deliveries. CGNL, however, was required to post bond to cover such future deliveries of gas. In the meantime, Pemex, Mexico's government-owned and operated petroleum gas corporation, began supplying gas to CGNL, thereby reducing the demand for imported gas. Moreover, on July 13, 1976, the Mexican government appointed an "interventor" and took immediate, total, and temporary possession of CGNL assets and rights in Mexico. On July 23, 1976, CGNL filed a complaint with the Commission seeking to prohibit Entex from terminating service and requesting the Commission to determine the currently effective rate for the sale of gas to CGNL. On August 18, 1976, the District Court for the Southern District of Texas stayed the

---

1. The Federal Power Commission was the predecessor of the Federal Energy Regulatory Commission. For simplicity, both will be referred to as "the Commission."

2. The Commission did not approve or review any of these amendments. Indeed, most were not filed with the Commission.

3. The base rate was initially fixed at $.34 per 1000 cubic feet of gas (Mcf), and was increased to $.54 per Mcf in 1975.

suit against Entex pending the outcome of the administrative proceeding.

The Administrative Law Judge ("ALJ") held hearings, and on February 15, 1977, concluded that, as a matter of regulatory law, the contract rate as amended was the currently effective rate, and that the 1944 rate did not apply despite Entex's failure to comply with the required filing of the price changes. On appeal, the District of Columbia Court of Appeals affirmed the ALJ's holding on this issue. *Compania de Gas, etc. v. Federal Energy Regulatory Commission*, 606 F.2d 1024 (D.C.Cir.1979).

Following resolution of the proceedings in the District of Columbia, the initial suit in Texas proceeded on both the tort and the contract claims. CGNL claimed below that: (1) Entex conspired unlawfully with various officials of the Republic of Mexico to obtain control of CGNL assets. (2) The Texas Railroad Commission had no authority to regulate CGNL's trade with Entex, and therefore, its order in Docket 500 had no effect on the price of gas charged to CGNL. (3) The pass-through provision was unconscionably in violation of Texas commercial law. (4) Entex had a duty to seek and collect the rate increases from Lo-Vaca's predecessor, United Gas Pipeline, before it passed them on to CGNL.

On October 7, 1980, the district court granted Entex's motion to dismiss the tort claim, holding that the act of state doctrine barred all inquiries into the alleged conspiracy. Following a trial on the contract claims, the court, on February 17, 1981, denied all relief to CGNL, and granted Entex's counterclaim for $937,935.18 for overdue payment, together with $297,723.70 in accrued interest, and $5,000 in attorney's fees.

## III. ANALYSIS

### A. *The Act of State Issue*

CGNL claims on appeal that the act of state doctrine does not apply to the present case, and furthermore, that the Hickenlooper amendment, 22 U.S.C. § 2370(e)(2) (1976), precludes Entex from invoking the doctrine.

The district court relied on *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), in disposing of this issue. Under the holding of *Hunt*, the district court concluded that "the plaintiff would have to prove that 'but for' the acts of the Defendant, the Mexican government would not have put a Mexican corporation whose assets are located in Mexico into receivership. This court would thus be forced to scrutinize the motives of the Mexican officials. Such an inquiry is clearly barred by the act-of-state doctrine."

The most recent pronouncement of the act of state doctrine in this circuit is found in *Industrial Investment Development Corp. v. Mitsui Co., Ltd.*, 594 F.2d 48 (5th Cir. 1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980). In *Mitsui*, we noted that the analysis in *Hunt* was unduly broad, and held that, in establishing a causal relation between the private violations alleged and the injuries suffered, a plaintiff was not required to establish that the defendant's acts were the sole cause of the injury. "[I]nquiry beyond the fact of some damage flowing from the unlawful conspiracy relates only to the amount and not the fact of damage." *Id.* at 55. We also held that an inquiry into the motivation of a foreign government was not as protected by the act of state doctrine as an inquiry into the validity of the foreign government's law or regulation. *Id.*

■ Even such a narrow interpretation of the act of state doctrine, however, would require the court to refrain from examining the claim of conspiracy here. As we noted in *Mitsui*, application of the doctrine is determined by balancing several factors, namely, the degree of involvement of the foreign state, whether the validity of its law or regulation was an issue, whether the foreign state was a named defendant, and whether there was a showing of harm to American commerce. 594 F.2d at 52–53.

■ Although the Government of Mexico is not a named defendant here, considera-

tion of the remaining factors shows that the district court did not err in dismissing the conspiracy claim. Resolution of the charges made by CGNL would require a determination of the legality of the Mexican government's action in appointing an "intervenor" to take over CGNL's operations in Nuevo Laredo, and the validity of such action under Mexican law. Furthermore, unlike the plaintiff in *Mitsui*, CGNL has not demonstrated that the conspiracy in any way affected United States commerce. A balancing of the competing interests involved shows that any analysis by this court would have an adverse effect on the relations between this country and Mexico.

The Restatement (Second) of Foreign Relations Law of the United States section 41 further supports this conclusion:

> [A] court in the United States ... will refrain from examining the validity of an act of a foreign state by which that state has exercised its jurisdiction to give effect to its *public interest* [emphasis added].

Illustration 6 under comment d is particularly instructive: "State A obtains by eminent domain proceedings title to an electric utility system in its territory. The vesting of title is an act of state within the meaning of the rule stated in this Section."

The district court concluded, and we agree, that the act of expropriation by the Mexican government was governmental, and not commercial. Therefore, the "purely commercial" exception to the act of state doctrine set forth in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), does not apply.

CGNL urges that an exception to the act of state doctrine exists when the governmental acts in question were procured through corruption, and cites *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680, 690 (S.D.N.Y.

1979), for support. We first note that, as the court below correctly observed, *Dominicus* cites the *Hunt* case in support of this proposition, yet, the *Hunt* court specifically refused to address the merits of this issue. *Hunt, supra,* 550 F.2d at 79. We similarly decline to address this issue. Based on the facts of this case, and viewing the record as a whole, we conclude that the Mexican government, by taking possession of CGNL assets, acted in an emergency to insure that the citizens of Nuevo Laredo receive uninterrupted service of natural gas.

CGNL also claims that a letter from the Mexican government allowing it to prosecute causes of action "before any authority, whether it be National or Foreign," constitutes an implied waiver by the Mexican government of the act of state defense. CGNL cites no case to support its assertion that an implied waiver by a non-litigating foreign government of the act of state defense operates to deprive a private defendant from asserting the defense. Although a clear and unambiguous statement by a foreign government that it would not object to a judicial examination of a public act undertaken by it may well influence an American court, it is but one of the many factors considered by courts in determining the applicability of the act of state doctrine.[4]

■ The facts of this case indicate, however, that the letter cited by CGNL does not constitute a waiver of the act of state defense by the Mexican government. Rather, it merely allows CGNL to pursue claims which might otherwise be foreclosed by the governmental order placing CGNL into receivership.

CGNL next claims that our decision in *Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co.*, 392 F.2d 706 (5th Cir.), *cert. denied*, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968), precludes application of

---

4. *Timberlane Lumber Co. v. Bank of America, N. T. & S. A.*, 549 F.2d 597, 614 (9th Cir. 1977); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1297–98 (3d Cir. 1979). There is no need to determine the weight of such a statement by a foreign government in relation to the other factors mentioned in the above cited cases. We similarly express no opinion on whether an express waiver by a litigating foreign government carries more or less weight than a similar statement by a non-litigating foreign government.

the act of state doctrine in this case. In *Tabacalera*, we held that the act of state doctrine did not preclude a federal court from entertaining a suit involving a debt by an American corporation in Florida owed a Cuban corporation, where the Cuban government had no physical control over the debt. We agree with the district court that *Tabacalera* does not apply here. First, the debt in *Tabacalera* was located in the United States, whereas here, the alleged confiscation of CGNL property occurred in Mexico. We do not accept CGNL's contention that the bond money it was required to deposit in the United States when it sought an injunction in the district court constitutes a sufficient res. We agree with the district court that the bond money is not related to the conspiracy claim, and therefore, CGNL cannot use it to circumvent the act of state doctrine. Second, the holding of *Tabacalera* fits well within the "purely commercial" exception to the act of state doctrine articulated in *Dunhill, supra*. We hold that the act of state doctrine precludes adjudication of the conspiracy claim by our court.

As a last resort, CGNL claims that the Hickenlooper amendment, 22 U.S.C. § 2370(e)(2) (1976), a legislative exception to the act of state doctrine, applies in this case. CGNL contends that the alleged conspiracy between Entex and the Government of Mexico, resulting in the seizure of CGNL assets in Mexico without compensation, violated United States and international law, giving rise to a claim in our courts.

■ The Hickenlooper amendment provides that unless the President of the United States suggests otherwise, or the act of state is not contrary to international law, "... no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is assert-

ed...." In *Banco Nacional de Cuba v. First National City Bank of New York*, 431 F.2d 394 (2d Cir. 1970), *rev'd on other grounds*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), Chief Judge Lumbard analyzed the amendment's legislative history, and concluded that Congress intended it to be limited to cases involving claims of title with respect to American owned property nationalized by a foreign government in violation of international law, when the property or its assets were subsequently located in the United States. 431 F.2d at 399–402. *See also Menendez v. Saks and Co.*, 485 F.2d 1355, 1372 (2d Cir. 1973), *rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Applying this principle to the present case, we hold that the Hickenlooper amendment is inapplicable because neither the nationalized property nor its proceeds are located in the United States.[5]

### B. *The Contract Claims*

CGNL raises three issues in its contract claims.

#### 1. The Preemption Issue:

■ The first of these issues deals with federal preemption over natural gas prices sold in interstate and foreign commerce. Briefly, CGNL argues that the Texas Railroad Commission order in Docket 500 should have no effect on the price of gas charged to it by Entex because the Natural Gas Act, 15 U.S.C. § 717 *et seq.* (1976) preempts any local regulation of foreign commerce, and only an order by the Commission could have an effect on the price of the gas sold. CGNL also argues that the filed rate doctrine renders the supplemental agreements between it and Entex (or its predecessors) invalid because they were not filed with, nor approved by, the Commission. We note that CGNL raised these same arguments before the Commission in its 1976 regula-

---

**5.** We express no opinion on whether the conspiracy claim, based on the act by the Mexican government placing CGNL in receivership amounts to a "claim of title or other right to property," or whether there has been a "confiscation or other taking" within the meaning of the Hickenlooper amendment.

tory complaint. The Commission rejected these arguments at the time, and its order was affirmed by the District of Columbia Court of Appeals. *Compania de Gas v. Federal Energy Regulatory Commission*, 606 F.2d 1024, 1028–29 (D.C.Cir.1979). We hold that CGNL is collaterally estopped from relitigating the question of federal preemption over the price of gas at issue because it had a "full and fair" opportunity to litigate this claim in the prior actions mentioned above. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n.5, 332–33, 99 S.Ct. 645, 649 n.5, 652, 58 L.Ed.2d 552 (1979); *Montana v. U. S.*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).[6] The fact that this issue is raised under the guise of a contract, rather than a regulatory, claim does not disguise the fact that the issue is identical.

2. The Unconscionability Issue:

CGNL next argues that Entex interprets the pass through clause as a "blank check," passing through increases in the cost of gas without first making an effort to collect such increases from its supplier, United Gas Pipeline Co. CGNL claims that such an interpretation of the clause is unconscionable, in violation of section 2.302 of the Texas Business and Commercial Code.

■■ The basic test for unconscionability under that section is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. Tex.Bus. & Comm.Code Ann. § 2.302, comm. 1 (Vernon 1968). The district court has concluded, and we agree, that the evidence shows that Entex has not acted in an unconscionable manner. On the

contrary, Entex provided CGNL with statements outlining the reasons for the price adjustments, including copies of Lo-Vaca's invoices to Entex, as well as periodical forecasts of the upward adjustments in the prices, in order to assist CGNL in obtaining Mexican government approval for a rate increase to its customers in Nuevo Laredo. Furthermore, the pass through provision did not result in a gross disparity between the amount paid and the consideration received; indeed, the clause served to bring the amount paid in line with the fair market value of the gas. We agree with the district court that the fact that CGNL, at the time it signed the pass through clause, had no alternative source of gas does not, by itself, render the clause or its application unconscionable. We hold that, upon the evidence presented, Entex has not interpreted the pass through clause as a "blank check,"[7] and did not act in an unconscionable manner.

3. The Duty to Collect Issue:

CGNL next argues that Entex had a duty to attempt to collect the increases in the price of gas from the predecessor of Lo-Vaca, United Pipeline, Inc., before it passed such increases to CGNL, and further, that because it had not made any such attempt, it could not collect the increases. CGNL contends that such a duty arises from a clause in the contract between United Gas Pipeline and Entex, which states that if one of the parties assigned its interest to another (as United did to Lo-Vaca), then that party would cause the acquiring entity to faithfully perform all the obligations created by the contract.

■ CGNL did not cite, and we have not found, any case that supports this proposition. We agree with the district court that

6. CGNL's reliance on *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) is misplaced. That case deals with the "filed rate" under §§ 4(c) and 4(d) of the Natural Gas Act, 15 U.S.C. §§ 717c(c) and (d), which apply only to gas in interstate, and not foreign, commerce. *See* 15 U.S.C. §§ 717a(6), (7); *CGNL v. FERC*, 606 F.2d 1024, 1029 n.6 (D.C.Cir.1979).

7. CGNL also argues that Entex has not provided it with a 60-day written notice of any price adjustments in the basic rate, thus acting unconscionably. As we mentioned in Part II, *supra*, however such price adjustments were automatic, therefore not requiring the 60-days notice, unlike price "increases" or "decreases," which do.

the relevant clause in the contract is nothing more than a general restatement of the universal proposition that a party to a contract cannot escape its contractual obligations by assigning the contract to another. The assignor, in effect, becomes a guarantor of the performance by the assignee. Tex.Bus. & Comm.Code Ann. § 2.210(a) (1968). On the evidence presented in this case, we hold that Entex had no duty to attempt to collect the increases in gas prices from United Gas Pipeline for the benefit of CGNL prior to passing them through.[8]

## IV. CONCLUSION

Having addressed each of CGNL's theories, we find that the district court was correct in dismissing the tort claim, and in holding for Entex on the contractual claims.

AFFIRMED.

---

**8.** Our holding on the duty issue disposes of the collateral estoppel and evidentiary issues raised by CGNL in parts D, E, and F of its brief. For the same reasons as stated above, we refuse to hold that, under the facts of the case, Entex had a duty to collect the increases in gas prices under an implied covenant of good faith and fair dealing.