705 F.2d 53
 1983-1 Trade Cases 65,325
 ASSOCIATED CONTAINER TRANSPORTATION (AUSTRALIA) LTD., Appellee,
v.
UNITED STATES of America, et al., Appellants.
HAMBURG-SUDAMERIKANISCHE DAMPSCHIFFAHRTS-GESELLSCHAFT,
EGGERT & AMSINCK d/b/a Columbus Line, Appellee,
v.
UNITED STATES of America, et al., Appellants.
FARRELL LINES, INC., Appellee,
v.
UNITED STATES of America, et al., Appellants.
 Nos. 995, 1177, 1176, Dockets 82-6242, 82-6314, 82-6316.
 United States Court of Appeals,
Second Circuit.
 Argued March 11, 1983.
Decided April 8, 1983.
 
 Stephen F. Ross, Dept. of Justice, Washington, D.C. (John J. Powers, III, Roger W. Fones, Catherine B. Klion, Dept. of Justice, Abbott B. Lipsky, Jr., Deputy, William F. Baxter, Asst. Attys. Gen., Steven E. Asher, Dept. of State, Fred L. Morrison, Counselor on International Law, Washington, D.C., of counsel), for appellant U.S.
 Gary D. Sesser, New York City (Burlingham Underwood & Lord, Elkan Turk, Jr., Wade S. Hooker, Jr., New York City, of counsel), for appellee Associated Container Transp. (Australia) Ltd.
 Gary D. Sesser, New York City (Haight, Gardner, Poor & Havens, Sanford C. Miller, Gary D. Sesser, Bernard J. Vaughan, New York City, of counsel), for appellee Hamburg-Sudamerikanische Dampschiffahrts-Gesellschaft, Eggert & Amsinck d/b/a Columbus Line.
 Gary D. Sesser, New York City (Cummings & Lockwood, Gary A. MacMillan, Robert L. Teicher, Stamford, Conn., of counsel), for appellee Farrell Lines Inc.
 Wald, Harkrader & Ross, Mark R. Joelson, Joseph P. Griffin, William R. Weissman, Bruce R. Stewart, Washington, D.C., of counsel, for amicus curiae Government of Australia.
 Before KAUFMAN and KEARSE, Circuit Judges, and MacMAHON, District Judge.*
 IRVING R. KAUFMAN, Circuit Judge:
 This appeal from a district court order setting aside certain portions of Civil Investigative Demands ("CID's") issued by the Justice Department pursuant to the Antitrust Civil Process Act, 15 U.S.C. Secs. 1311-1314, presents difficult issues of first impression.
 With due regard to the manifest authority of the executive branch to conduct antitrust investigations, we are called upon to weigh the Government's legitimate need for requested information against appellees' claim that disclosure will interfere with both their unquestioned right to petition government agencies and the smooth functioning of foreign relations. More specifically, we are required to determine whether appellees' communications with the U.S. Federal Maritime Commission are shielded from Justice Department inquiry by the Noerr-Pennington doctrine, and whether the so-called "act of state" doctrine prohibits this Court from enforcing the Government's request for communications between the appellees and governmental bodies in Australia and New Zealand. Because we believe that under the circumstances of this case, neither the Noerr-Pennington doctrine nor the act of state doctrine should be applied to bar enforcement of the challenged CID's, we reverse the order of the district court.
 * Since this case reaches us well before any determination has been made to charge an antitrust violation, there are no pleadings to which we can refer and the facts relevant to this controversy over the production of documents must of necessity be stated briefly.
 Spurred by complaints from independent ocean carriers concerning their alleged illegal exclusion from certain international shipping, the Department of Justice began an investigation into possible antitrust violations committed by the principal carriers of meat, livestock and wool to the United States from Australia and New Zealand. The appellees, Associated Container Transportation (Australia) Ltd. ("Associated Container"), Hamburg-Sudamerikanische Dampfschiffahrts-Gesellschaft, Eggert & Amsinck ("Columbus Line") and Farrell Lines, Inc. ("Farrell Lines") were among the targets of this investigation.[1]
 As substantial participants in the Australia/New Zealand-United States shipping market, appellees are members of various shipping conferences and agreements including the U.S. Atlantic & Gulf/Australia-New Zealand Conference, the Australia/Eastern U.S.A. Shipping Conference and the New Zealand/U.S. Atlantic & Gulf Shipping Lines Rate Agreement. These conferences hold regular meetings to discuss trade matters, non-conference competition and rate levels, and to decide upon rate increases or reductions. Conference members also enter written agreements establishing rates and regulations governing international shipping which are subject to approval by the Federal Maritime Commission ("FMC") pursuant to the Shipping Act, 46 U.S.C. Sec. 814. The FMC will not approve agreements it finds to be "discriminatory or unfair [as between competing shippers], ... or [which otherwise] operate to the detriment of the commerce of the United States ...." Id. It must also disapprove any agreements between carriers of different conferences which would otherwise be naturally competitive unless the arrangements provide that each carrier retain the right of independent action. Id. Only those agreements made lawful by the Shipping Act are immune from the antitrust laws. Id.[2] The activities of conference members allegedly outside this antitrust exemption were the primary focus of the Justice Department's inquiry.
 To further its investigation and to substantiate charges that appellees had engaged in illegal conduct such as predatory pricing, reciprocal dealing and group boycotts, the Department of Justice in May and June 1980 issued Civil Investigative Demands ("CID's") pursuant to the Antitrust Civil Process Act, 15 U.S.C. Secs. 1311-1314. Virtually identical CID's were served on each appellee.[3] The Government requested detailed information concerning the shippers' activities including minutes from conference meetings, descriptions of internal firm structure, and copies of various shipping contracts. Most significant for purposes of this dispute, the Department of Justice also sought to obtain communications between the appellees and the U.S. Federal Maritime Commission and communications between appellees and the Australian Meat and Live-stock Corporation ("AMLC")[4] and the New Zealand Wool Board ("NZWB").
 The AMLC is an agency of the Australian government, which oversees all aspects of the meat industry. No shipper may enter into a contract to export meat from Australia without AMLC approval. Section 14, Australian Meat and Live-stock Corporation Act, 1977, Joint Appendix ("J.A.") at 83-90. The New Zealand Wool Board performs similar functions for wool in New Zealand. New Zealand Wool Industry Act, 1977, J.A. at 102-108. The Department of Justice does not dispute that the AMLC and the NZWB are legitimate instrumentalities of their respective governments.
 Each appellee filed a timely petition to set aside the CID's, pursuant to 15 U.S.C. Sec. 1314(b). The appellees also served interrogatories on the Department of Justice seeking to discover in greater depth the substance of the Government's investigation. Overruling the Government's objections to appellees' queries, Judge Brieant held the appellees had a right to reasonable discovery since they alleged "facially legitimate objections to the authority of the Antitrust Division to investigate their activities." Associated Container Transportation (Australia) Ltd. v. United States, 502 F.Supp. 505, 510 (S.D.N.Y.1980). The Justice Department then answered the interrogatories and cross-petitioned for enforcement of its CID's.
 
 
 1
 Judge Brieant granted the Government's cross-petitions in most respects and ordered the CID's enforced.[5] He concluded that the possible exemption from the antitrust laws provided by the Shipping Act, 46 U.S.C. Sec. 814 was insufficient to shield alleged conduct such as reciprocal dealing, predatory pricing and group boycotts from antitrust liability. He also determined that complaints from competing shippers were an adequate ground to justify an investigation. In two important respects, however, the district court denied enforcement of the CID's.
 
 
 2
 The district judge accepted appellees' argument that their communications with the Federal Maritime Commissioner were shielded from government inquiry by the Noerr-Pennington doctrine which immunizes from antitrust prosecution "[joint efforts] to influence the passage or enforcement of laws." Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135, 81 S.Ct. 523, 528, 5 L.Ed.2d 464 (1961). Accordingly, he refused to enforce those portions of the CID's which sought information concerning appellees' communications with the FMC regarding FMC Agreement Nos. 9450 and 10268 (agreements establishing the rules and regulations of the Australia/Eastern U.S.A. Shipping Conference) and appellee contacts with FMC commissioners.[6]
 
 
 3
 The district court also would not permit the Justice Department to investigate appellees' contacts with the AMLC and the NZWB. It found such an inquiry would require the court to question the motives of foreign governmental bodies responsible for selecting the ocean carriers able to transport goods from their respective countries. Relying on Hunt v. Mobil Oil Corp., 550 F.2d 68 (2d Cir.), cert. denied, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), which interpreted the act of state doctrine as prohibiting United States courts from probing the motives of foreign governments, Judge Brieant, therefore denied enforcement of those portions of the CID's seeking information concerning appellees' communications with agencies of the Australian and New Zealand governments.[7] The United States appeals from Judge Brieant's order.
 
 II
 
 4
 We commence our consideration of the Government's efforts to enforce the challenged CID's by recognizing the broad investigatory powers granted to the Justice Department by the Antitrust Civil Process Act ("ACPA"), 15 U.S.C. Secs. 1311-1314. Congress has explicitly authorized the Antitrust Division to request the production of any documentary material, answers to written interrogatories or oral testimony which it has reason to believe is relevant to a civil antitrust investigation, 15 U.S.C. Sec. 1312(a).[8] Moreover, ACPA's legislative history indicates that the Justice Department is to be given wide latitude when issuing CID's. Although the permissible scope of CID provisions is governed by either the grand jury subpoena standard or the civil discovery standard, see 15 U.S.C. Sec. 1312(c)(1)(A) & (B), the House report accompanying the 1976 amendments to ACPA reveals a preference for the less stringent grand jury subpoena standard, "tailored as it is to reflect the broader scope and less precise nature of investigations." H.Rep. No. 1343, 94th Cong., 2d Sess. 11 (1976), reprinted in [1976] U.S.Code Cong. & Ad.News 2596, 2606.[9]
 
 
 5
 In sum, the unmistakable purpose of ACPA was to facilitate the Justice Department's efforts to obtain evidence during the course of a civil investigation. See H.Rep. No. 1386, 87th Cong., 2d Sess. (1962), reprinted in [1962] U.S.Code Cong. & Ad.News, 2567, 2568.
 
 
 6
 Aware of the difficulty of resisting legitimate government inquiries, appellees do not challenge the specificity of the CID's, nor do they claim the burden of compliance would be "unreasonable or oppressive," objections traditionally raised in response to grand jury subpoenas. See Brown v. United States, 276 U.S. 134, 142-43, 48 S.Ct. 288, 289-90, 72 L.Ed. 500 (1928); see also Fed.R.Crim.P. 17(b); cf. Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 195, 66 S.Ct. 494, 498, 90 L.Ed. 614 (1946) (administrative subpoena). Neither do appellees principally rely on the Government's inability to demonstrate that the CID's are "reasonably calculated to produce admissible evidence." Fed.R.Civ.P. 26(b). Rather they depend upon independent considerations, inherent in both the Noerr-Pennington and act of state doctrines, which they believe immunize the requested communications. We will discuss the proper application of these legal principles seriatim.
 
 A. Noerr-Pennington
 
 7
 It is beyond peradventure that concerted efforts to influence public officials are generally immune from Sherman Act prosecution regardless of anticompetitive purpose or effect. See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., supra, 365 U.S. at 135, 81 S.Ct. at 528; United Mine Workers of America v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). Indeed, the right to petition the government is fundamental to our representative democracy, and the Supreme Court has repeatedly made clear that the antitrust laws were not intended to interfere with this basic freedom. Id. The Noerr-Pennington doctrine, however, is not without exceptions. It does not for example shield those who attempt to abuse the governmental process for the purpose of injuring a competitor. See California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In addition, the appellees are not resisting formal antitrust charges and cannot, therefore, simply rely on a doctrine which protects from prosecution businesses seeking to influence the enforcement of laws. To prevail on this appeal, appellees must demonstrate not that their conduct may be immune from prosecution, but rather that their communications with the Federal Maritime Commission are beyond the scope of legitimate inquiry. We believe they have failed to make such a showing.
 
 
 8
 Appellees contend their attempts to gain FMC approval of their shipping agreements are protected by the Noerr-Pennington doctrine. Accordingly, they argue, these actions are "exempt" from the antitrust laws and cannot be the subject of a civil investigative demand. The House report accompanying the 1976 amendments to the Antitrust Civil Process Act does indicate that a CID recipient may refuse to comply with any CID "if the Division has no jurisdiction to conduct an investigation--which will be the case if the activities at issue enjoy a clear exemption from the antitrust laws." H.Rep. No. 1343, 94th Cong., 2d Sess. 1, 11 (1976) (emphasis added), reprinted in [1976] U.S.Code Cong. & Ad.News at 2606. That discussion goes on to provide, however, that
 
 
 9
 the Committee stresses that the scope of many antitrust exemptions is not precisely clear; and many others, especially those among the regulated industries and what were formally term[ed] "the learned professions" are currently being narrowed by statute or judicial [r]ulings. In these many cases, the applicability of an asserted exemption may well be a central issue in the case. If so, the mere assertion of the exemption should not be allowed to halt the investigation.
 
 
 10
 Id. n. 30 (emphasis added).
 
 
 11
 The Noerr-Pennington immunity of appellees' contacts with the FMC is far from clear. As we have noted, Noerr-Pennington does not protect abuses of the governmental process. Misrepresentations, for example, may not be condoned in an adjudicatory process. California Motor Transport Co. v. Trucking Unlimited, supra, 404 U.S. at 513, 92 S.Ct. at 613. Similarly, a pattern of baseless repetitive claims may induce antitrust liability. Id.; see also Litton Systems v. American Telephone & Telegraph Co., 700 F.2d 785, 809-812 (2d Cir.1983). At this preliminary stage of the proceedings it simply cannot be determined whether appellees' efforts to obtain approval of their shipping agreements involved any such abuses.
 
 
 12
 Appellees place considerable weight on the Justice Department's inability to provide interrogatory answers showing a reasonable basis to believe that the shippers' conduct falls within this so-called "sham" exception to Noerr-Pennington. It is wholly unsurprising, however, that the Government refuses to speculate on the nature of documents it has not yet had the opportunity to review. Only after the Antitrust Division has examined the requested communications will it be able to decide intelligently whether appellees' conduct violates the Sherman Act. At that point, should the Government choose to bring charges, appellees can raise their Noerr-Pennington defense for evaluation by the court. In addition, even were the Justice Department to conclude that none of the appellees' communications with the FMC gave rise to antitrust liability, those documents might alert the authorities to other evidence revealing an illegal antitrust conspiracy entirely unrelated to appellees' legitimate activities before the FMC. Indeed, several complaints from independent shippers concerning the efforts of conference members to exclude competition suggest that the CID's are "reasonably calculated to produce admissible evidence" regardless of possible Noerr-Pennington immunity which might shield some of appellees' activity. See North Carolina Electric Membership Corp. v. Carolina Power & Light Co., 666 F.2d 50, 52-53 (4th Cir.1981) (Noerr-Pennington inapplicable to discovery).
 
 
 13
 Appellees further allege that enforcement of the CID's will have a chilling effect on their first amendment rights. Initially, we find it difficult to see how any chill will take place. The affidavit of Kenneth R. Egan, Vice President of Columbus Line, indicates merely that issuance of the CID's has made certain ocean carriers more attentive to the possible antitrust implications of their activities. This salutary result stands in marked contrast to the threat to legitimate political activity which in some cases may be engendered by public disclosure. Cf. NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (membership list of civil rights organization constitutionally protected from state scrutiny).
 
 
 14
 Moreover, this Court has previously rejected a claim that a subpoena addressed to a business publication was unenforceable because the publication was a "bona fide newspaper" and therefore exempt from the provisions of the Investment Advisers Act pursuant to 15 U.S.C. Sec. 80b-2(a)(11). SEC v. Wall Street Transcript Corp., 422 F.2d 1371 (2d Cir.), cert. denied, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970) (Securities and Exchange Commission could with constitutional propriety subpoena advertising and subscriber records.) The court held that "the question of the inclusion of a particular person or entity with the coverage of a regulatory statute is generally for initial determination by an agency." Id. at 1375. In the absence of any showing that appellees will suffer adverse repercussions from the disclosure of constitutionally protected communications, similar principles apply here. Although the Antitrust Division is not a traditional regulatory agency, it is responsible for enforcing the Sherman Act, and indeed ACPA provides specific congressional authorization for the Justice Department's requests. See Oklahoma Press Publishing Co. v. Walling, supra, 327 U.S. at 214, 66 S.Ct. at 508. Only when permitted to utilize its investigatory authority will the Division be able to exercise its expertise to determine whether the antitrust laws have been violated or whether the Noerr-Pennington doctrine immunizes appellees' conduct. If at some later date, appellees believe the Justice Department has misapplied the law, it may raise its Noerr-Pennington defense in court at the appropriate time. Accordingly, the Noerr-Pennington doctrine does not bar enforcement of the challenged CID's at this incipient stage of the inquiry.
 
 B. Act of State Doctrine
 
 15
 Appellees' invocation of the act of state doctrine to protect their communications with the Australian and New Zealand governments is similarly premature.[10] "[That] doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). Rooted in considerations of international comity and separation of powers, the act of state doctrine has been applied to prevent the judicial branch from inquiring into the Cuban government's expropriation of sugar within its borders, id., to preclude a labor union from invoking federal court jurisdiction to challenge alleged price-fixing by foreign sovereigns, International Association of Machinists and Aerospace Workers v. Organization of Petroleum Exporting Countries, 649 F.2d 1354 (9th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982), and to bar suit by a Venezuelan national for damages allegedly incurred when a military authority denied plaintiff a passport, Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). In essence, courts have recognized that the conduct of foreign relations is within the province of the executive branch and have refused under certain circumstances to become embroiled in international political controversies.
 
 
 16
 The mere fact that a lawsuit involves activities abroad, however, does not imply that American courts are without jurisdiction. See, e.g., Filartiga v. Pena-Irala, 630 F.2d 876, 889-90 (2d Cir.1980). The Supreme Court has indicated that application of the act of state doctrine depends upon a "balance of relevant considerations," Banco Nacional de Cuba v. Sabbatino, supra, 376 U.S. at 428, 84 S.Ct. at 940, and this Court has mandated "a careful case-by-case analysis of the extent to which the separation of powers concerns ... are implicated." Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 316 n. 38 (2d Cir.1981), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). For several reasons, that analysis reveals the act of state doctrine is not implicated by the Justice Department's attempts to enforce the challenged CID's.
 
 
 17
 The Government's attempts to enforce the challenged CID's simply do not present the traditional situation where courts must assess the legitimacy of actions taken by a foreign government before reaching a determination on the merits of a party's case. The Antitrust Division does not ask this Court to question the validity of actions taken by the Australian and New Zealand governments, see Banco Nacional de Cuba v. Sabbatino, supra, 376 U.S. at 401, 84 S.Ct. at 926. Indeed, our determination that appellees must relinquish the requested documents does not involve an evaluation of the propriety of decisions made by the AMLC or the NZWB. We need decide only that the Justice Department has demonstrated a reasonable basis to believe the requested information is relevant to a legitimate antitrust investigation, see 15 U.S.C. Sec. 1312(a). As previously noted, the Government has satisfied this requirement. Accordingly, appellees cannot rely on the courts' unwillingness to adjudicate matters which may require them to express views contrary to those of the executive branch on the validity of actions taken by a foreign sovereign. Instead, appellees invite us to halt an on-going investigation being conducted by the Justice Department, a division of the executive branch whose independence the act of state doctrine primarily protects.[11] We decline to do so.
 
 
 18
 Appellees argue that the antitrust investigation will necessarily entail an examination of the motives of the AMLC and the NZWB. Our decision in Hunt v. Mobil Oil Corp., 550 F.2d 68 (2d Cir.), cert. denied, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), they allege, makes such an inquiry impermissible. In Hunt, private plaintiffs brought suit against major oil producers alleging that an illegal antitrust conspiracy among them had caused the Libyan government to nationalize the Hunt oil fields. This Court affirmed Judge Weinfeld's dismissal of the action because the claim "is ... not viable unless the judicial branch examines the motivation of the Libyan action and that inevitably involves its validity." Hunt v. Mobil Oil Corp., supra, 550 F.2d at 77 (emphasis added). We find Hunt clearly distinguishable.
 
 
 19
 Initially, this case reaches us well before the Government has determined whether to make formal antitrust charges. The requested documents may reveal antitrust violations wholly unrelated to either the validity of actions taken by the Australian or New Zealand governments or the motives of these foreign sovereigns. In addition, since the Hunts could not prevail without establishing "a clear causal connection between the violation alleged and the injuries allegedly suffered," Salerno v. American League of Professional Baseball Clubs, 429 F.2d 1003, 1004 (2d Cir.1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971) (quoting Molinas v. National Basketball Association, 190 F.Supp. 241, 243 (S.D.N.Y.1961)), they could not succeed without proving that the defendants' conspiracy caused the Libyan government to confiscate their property. The Justice Department, of course, need not demonstrate private injury to establish a violation of the antitrust laws. It could prove, for example, that appellees attempted to monopolize the market for shipping certain commodities between Australia/New Zealand and the United States without making any claims concerning the acts or motivations of the Australian government. See 15 U.S.C. Sec. 2. Accordingly, it cannot be determined at this stage of the proceedings whether any court will ever be called upon to investigate the validity of actions taken by a foreign government. Under these circumstances, we believe judicial refusal to enforce legitimate Government requests for information would constitute an unwarranted extension of the act of state doctrine.
 
 III
 
 20
 Our conclusion that the Noerr-Pennington doctrine and the act of state doctrine do not bar enforcement of the challenged CID's in no way indicates that these doctrines may not properly be invoked at a later stage of these proceedings should the Justice Department decide to bring formal charges. We hold merely that appellees have failed to demonstrate that the important considerations underlying these fundamental principles of law are sufficiently implicated by the Government's requests to justify blocking a congressionally authorized investigation.
 
 
 21
 The order of the district court is reversed.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Hamburg-Sudamerikanische Dampfschiffahrts-Gesellschaft, Eggert & Amsinck is organized under the laws of the Federal Republic of Germany. Associated Container is organized under the laws of the United Kingdom. Farrell Lines is a New York corporation
 
 
 [2]
 On March 1, 1983 the Senate passed S. 47, a bill which would broaden the antitrust exemption for ocean carriers and render them essentially immune from antitrust prosecution, but the House has yet to act upon the bill. The Senate's perception that current statutes do not fully protect shippers from antitrust liability, further underscores the legitimacy of the Justice Department's investigation under present law
 
 
 [3]
 On May 13, 1980, the Department of Justice issued CID No. 3760 which was served upon Associated Container and CID No. 3764 served on Columbus Line. The original CID served on Farrell Lines was quashed without prejudice to reissuance and Farrell Lines was eventually served with CID No. 4584 on July 22, 1981
 
 
 [4]
 Prior to 1977 the functions of the Australian Meat and Live-stock Corporation were carried out by the Australian Meat Board. The CID's at issue also seek communications between appellees and this now defunct organization. For convenience the Australian Meat and Live-stock Corporation and the Australian Meat Board will jointly be referred to as "AMLC."
 
 
 [5]
 Similar CID's issued to other carriers were enforced against challenge in the United States District Court for the Northern District of California. Pacific/Australia-New Zealand Conference v. United States, Nos. 80-3015, -3016, -3382 (N.D.Cal. Mar. 26, 1982), appeal dismissed Nos. 82-4205, -4218, -4219 (9th Cir. May 17, 1982). The United States District Court for the District of Columbia granted partial enforcement to virtually equivalent CID's, setting aside only those portions seeking communications between the shipping conferences and agencies of the U.S. Government. Australia/Eastern U.S.A. Shipping Conference v. United States, 537 F.Supp. 807 (D.D.C.1982), appeal argued, Nos. 82-1516, -1683 (D.C.Cir. Jan. 10, 1983)
 
 
 [6]
 Judge Brieant struck p C.9 from each CID which requested "All documents relating or referring, directly or indirectly, to the dissolution of FMC Agreement No. 9450 and the creation of FMC Agreement No. 10268." He also vacated p C.4(l) from CID No. 3760 and p C.4(k) from CID's Nos. 3764 and 4584. These paragraphs sought
 With respect to the U.S./Australia-New Zealand and Australia-New Zealand/U.S. trades, all documents relating or referring, directly or indirectly, to contacts with any Commissioners of the FMC by the U.S. Atlantic & Gulf/Australia-New Zealand Conference, Pacific Coast Australia Tariff Bureau, or any members thereof, in which such Commissioners were requested to contact officials of the Government of Japan regarding the use of Japanese flag vessels by [independent carriers].
 
 
 [7]
 The district court declined to enforce paragraph Nos. C.6 and C.7 of each CID which requested
 all documents relating or referring, directly or indirectly, to any agreement or contract, written or oral, formal or informal, between the New Zealand Wool Board and the New Zealand/U.S. Atlantic & Gulf Shipping Lines Rate Agreement ("NZ/USA & GSLRA") or its members in which the New Zealand Wool Board agreed to restrict its patronage in the trade to the members of the NZ/USA & GSLRA.
 and
 All documents relating or referring, directly or indirectly, to any agreement or contract, written or oral, formal or informal, between the Australian Meat Board (or its successor, the Australian Meat and Livestock Commission [sic] and Farrell Lines, Columbus Line, Australia National Line, Associated Container Transportation, Atlantraffik Express Service, and Refrigerated Express Service, or any one or more of those lines, in which the Australian Meat Board agreed to restrict its patronage for the transportation of meat to all or any part of the United States to any one or more of them.
 
 
 [8]
 15 U.S.C. Sec. 1312(a) provides in part
 Whenever ... the Department of Justice has reason to believe that any person may be in possession, custody, or control of any documentary material, or may have any information, relevant to a civil antitrust investigation, [it] may, prior to the institution of a civil or criminal proceeding thereon, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to answer in writing written interrogatories, to give oral testimony concerning documentary material or information, or to furnish any combination of such materials answers or testimony.
 
 
 [9]
 In discussing the permissible scope of CID provisions the House Report accompanying the 1976 amendments to ACPA notes,
 the civil discovery standards are tailored to meet the requirements of formal, adversary, adjudicatory proceedings. Unlike investigations, adjudications feature detailed pleadings setting forth specific allegations and responses. The issues will necessarily be more narrowly-drawn and well-defined than they can possibly be during an investigation.
 Thus, the grand jury subpoena standard, tailored as it is to reflect the broader scope and less precise nature of investigations, may in this one respect seem to be a more appropriate standard for antitrust investigations than a rigidly-applied, post-complaint civil discovery standard would be.
 H.Rep. No. 1343, 94th Cong., 2d Sess. 11 (1976), reprinted in [1976] U.S.Code Cong. & Ad.News 2596, 2606.
 
 
 [10]
 Our comments concerning the inapplicability of the Noerr-Pennington doctrine at this stage of the proceedings are equally pertinent to the Government's request for appellees' communications with the AMLC and the NZWB. We need not consider, therefore, whether Noerr-Pennington would apply to appellees' contacts with foreign governments. See Coastal States Marketing Inc. v. Hunt, 694 F.2d 1358, 1364-1367 (5th Cir.1983) (Noerr-Pennington applicable to petitioning of foreign governments); see also Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962); but cf. Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F.Supp. 92, 108 (C.D.Cal.1971), aff'd per curiam on other grounds, 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972) (Noerr-Pennington does not protect applications to governments of other nations)
 
 
 [11]
 We agree with Judge Brieant that the mere existence of a telephone connection between the Justice Department and the Department of State is insufficient to indicate approval of an investigation by the division of government responsible for conducting foreign relations. The State Department's failure to intervene on either side, however, makes us less wary of permitting the Justice Department to execute its congressionally authorized responsibilities, than we might be if the appellees could demonstrate an articulated foreign policy with which these CID's might interfere. Indeed, we note that Steven E. Asher, an attorney from the Department of State, is named as one of the lawyers assisting the Antitrust Division in preparing its reply brief before this Court