[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 27, 2003
THOMAS  K. KAHN
CLERK

_____

No. 02-10333

_____

D. C. Docket No. 01-00511-CV-4-RH

MAJOR LEAGUE BASEBALL,
ALLAN H. SELIG,
TAMPA BAY DEVIL RAYS LTD,
FLORIDA MARLINS BASEBALL CLUB LLC,

Plaintiffs-Appellees,

versus

CHARLIE CRIST,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(May 27, 2003)**

Before TJOFLAT and BLACK, Circuit Judges,  and GOLDBERG*, Judge.

_____

*Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by
designation.

TJOFLAT, Circuit Judge:

For better or worse, professional baseball has long enjoyed an exemption from the antitrust laws.[1] The scope of this exemption – a judge-made rule premised upon dubious rationales[2] and labeled an "aberration" by the Supreme Court[3] – has been the subject of extensive litigation over the years. In this case, we are called upon to address two key issues: (1) the effect of the federal rule upon state antitrust law and (2) whether the exemption extends beyond antitrust prosecutions into the realm of mere investigations. With regard to the first issue, we hold that the federal exemption preempts state antitrust law. As for the second issue, we hold that the Florida Attorney General cannot proceed with the investigation in this case. This holding is based upon the Fourth Amendment[4] and state law rather than the antitrust exemption. In this vein, our analysis differs

---

[1]The exemption has been crystalized by three Supreme Court decisions. See Fed. Baseball Club of Baltimore, Inc. v. Nat'l League of Prof'l Baseball Clubs, 259 U.S. 200, 42 S. Ct. 465, 66 L. Ed. 898 (1922); Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S. Ct. 78, 98 L. Ed. 64 (1953); Flood v. Kuhn, 407 U.S. 258, 92 S. Ct. 2099, 32 L. Ed. 2d 728 (1972).

[2]See part IV, infra.

[3]See Flood, 407 U.S. at 282, 92 S. Ct. at 2112 (stating that "the aberration is an established one"); Id. at 269, 92 S. Ct. at 2105 ("We granted certiorari in order to look once again at this troublesome and unusual situation.").

[4]The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." For convenience, we omit reference to the Fourteenth Amendment.

significantly from that of the district court, although we ultimately affirm its decision.

I.

A.

Major League Baseball ("MLB") is an unincorporated association of thirty major league baseball clubs. On November 6, 2001, a supermajority of the clubs voted in favor of eliminating two teams from the league. The Florida Marlins and the Tampa Bay Devil Rays voted in favor of contraction. The former Attorney General of Florida, Robert Butterworth, is a fan of baseball, but not of MLB's contraction policy. According to one newspaper, Butterworth proclaimed that "[i]t's not going to be easy for baseball to leave the state of Florida . . . . We finally got a team in Tampa Bay, and we're going to do all we can to keep it." See Joe Follick, State Starts Battle Over Contraction, The Tampa Tribune, Nov. 14, 2001. Similarly, Butterworth is reported to have said, "I'm out here to do whatever I can do to keep [baseball] in Florida if at all possible." See Lesley Clark & Clark Spencer, Baseball Cutback Plan Challenged, The Miami Herald, Nov. 25, 2001. Making good on his promise, the Attorney General issued several civil investigative demands ("CIDs") to Major League Baseball, Commissioner Allan H.

Selig, the Tampa Bay Devil Rays, Ltd., and the Florida Marlins Baseball Club, LLC – all of whom are plaintiffs in this case. The CIDs were issued pursuant to the Attorney General's authority under Florida'santitrust statute, Fla. Stat. §

542.28.[5]  The CIDs were broad in scope, requiring that each recipient answer

---

[5]The pertinent part of section 542.28 states as follows:

**542.28  Civil investigative demand.—**

(1)   Whenever the Attorney General . . . has reason to believe that any person may be in possession, custody, or control of any documentary material, or may have any information, which documentary material or information is relevant to a civil antitrust investigation authorized by s. 542.27(3), the Attorney General or such state attorney may, prior to the institution of a civil or criminal proceeding thereon, issue in writing and cause to be served upon such person a civil investigative demand . . . .

\*          \*          \*

(3) No such demand shall require the production of any documentary material, the submission of any answers to written interrogatories, or the giving of any oral testimony if such material, answers, or testimony would be protected from disclosure under:

(a) The standards applicable to subpoenas or subpoenas duces tecum issued by a court of this state in aid of a grand jury investigation; or

(b) The standards applicable to a discovery request under the Florida Rules of Civil Procedure, to the extent that the application of such standards to any such demand is appropriate and consistent with the provisions and purposes of this chapter.

\*          \*          \*

(5) Within 30 days after the service of an investigative demand upon any person or at any time before the return date specified therein, whichever period is longer, the person served may file in the circuit court . . . a petition for an order of the court modifying or setting aside the demand . . . .

We know that the CIDs were based solely upon the Attorney General's authority to investigate antitrust violations for several reasons.  First, each CID said on its face that it was "issued pursuant to the Florida Antitrust Act of 1980, Section 542.28, Florida Statutes."  No other authority was identified for their issuance.  Second, the stated reason for issuing the CIDs, as noted on the face of the CIDs, was "to determine whether there is, has been or may be a violation of . . . the [state or federal antitrust laws] . . . by conduct, activities, or proposed action of the following nature: possible contracts, combinations, or conspiracies in restraint of trade, or monopolization, attempted monopolization, or combinations or conspiracies to monopolize trade or commerce, relating to the proposed contraction and/or relocation of the Tampa Bay Devil Rays and/or the Florida Marlins."  Third, the Attorney General acknowledged before this court that the CIDs' only purpose was to investigate a possible antitrust violation arising out of the contraction agreement.  When asked at oral argument whether the CIDs would have issued but for the threatened contraction, the Attorney General answered in the negative.

5

several interrogatories[6] and produce voluminous documents.[7]

The recipients of the CIDs had several options available, but only one option could yield the desired result. The most obvious option would have been to comply with the terms of the CIDs. But this option was unattractive because the CIDs were burdensome, and the recipients believed that the federal exemption gave them a "federal right" to be free not only from antitrust *prosecution*, but also from this *investigation*. Second, the recipients of the CIDs could have filed suit in state court pursuant to Fla. Stat. § 542.28(3)-(5)[8] under the theory that since the business of baseball is immune from antitrust prosecution, the Attorney General's investigation is baseless and therefore flunks the "grand jury" and "Florida Rules of Civil Procedure" tests established by subsections (3)(a) and (3)(b), respectively. This option was similarly unattractive because Commissioner Selig, MLB, and the two Florida clubs would have found it impossible to convince a Florida trial court

---

[6]For example, the plaintiffs were asked to identify all meetings, agreements, and communications relating to contraction of the two Florida teams; describe the process by which Major League Baseball attempts to obtain new stadia; detail the balance sheet for the two Florida clubs; discuss alternatives to contraction; and identify how and why club owners voted on the question of contraction.

[7]The Attorney General requested the production of organizational charts; studies, research, reports, and recommendations relating to contraction; bylaws, constitutions, and rules that govern Major League Baseball; notes and documents concerning the contraction meeting; profit and loss statements; revenue sharing agreements; and ownership applications and documents assessing the anticipated viability of the Florida clubs.

[8]See note 5, supra.

to adopt the first premise of the argument – namely, that the "business of baseball" is immune from antitrust prosecution. This is because the Supreme Court of Florida held in an earlier decision that the antitrust exemption established by federal law extends only to the reserve system[9] rather than broadly exempting the "business of baseball." See Butterworth v. Nat'l League of Prof'l Baseball Clubs, 644 So.2d 1021 (Fla. 1994).[10] This left option three: an action in federal court, the present lawsuit.

B.

The plaintiffs' complaint is based upon two theories. Under the first theory, the plaintiffs contend that (a) there is a "federal right" that exempts "the business of baseball" as a proper subject of an antitrust enforcement suit and (b) this federal

---

[9]In Flood, 407 U.S. at 260 n.1, 92 S. Ct. at 2100 n.1, Supreme Court described the reserve system as follows:

> The reserve system, publicly introduced into baseball contracts in 1887 . . . . centers in the uniformity of player contracts; the confinement of the player to the club that has him under the contract; the assignability of the player's contract; and the ability of the club annually to renew the contract unilaterally, subject to a stated salary minimum.

[10]The Florida Supreme Court's holding has scant support in the case law; the vast majority of lower courts have held that the exemption created by the U.S. Supreme Court extends more broadly to the "business of baseball." Some of these cases were cited by the district court. See Major League Baseball v. Butterworth, 181 F.Supp. 2d. 1316, 1322 n.4 (N.D. Fla. 2001). Lest there be any doubt about the matter, the district court forcefully destroyed the notion that the antitrust exemption should be narrowly cabined to the reserve system. Id. at 1322-1332. Given the persuasiveness of the district court's reasoning, in conjunction with the fact that the Attorney General no longer argues that the antitrust exemption should be so narrowly construed, we see no need to expound upon the matter.

right extends to administrative investigations. We call this the "penumbra" theory because, like Justice Douglas's theory of the Bill of Rights,[11] the claim posits that a core federal right (i.e., exemption from antitrust *prosecution*) has a shadow which extends the right to encompasses much more (i.e., an exemption from antitrust *investigation*). Having established this broad federal right, the plaintiffs argue that this right precludes the Attorney General's investigation. This is so even if the state investigation is premised solely upon state antitrust law, because state antitrust law, to the extent that it is applied to the business of baseball, is preempted by federal law and violates the Commerce Clause.[12]

The plaintiffs also invoke another model. Like the penumbra theory, the second model continues to argue that federal law exempts the business of baseball from antitrust regulation, and that the Supremacy Clause and the Commerce Clause preclude the application of state antitrust law to the extent that state law is inconsistent with federal policy. Unlike the penumbra theory, however, the second theory does not contend that an exemption from prosecution necessarily includes

---

[11]See Griswold v. Connecticut, 381 U.S. 479, 484, 85 S. Ct. 1678, 1681, 14 L. Ed. 2d 510 (1965).

[12]The plaintiffs claim that state regulation of baseball via antitrust litigation would inevitably entail extensive extraterritorial effects and impose a heavy burden on interstate commerce. Therefore, the plaintiffs contend that courts have erected a rare *per se* rule under the Commerce Clause that, rather than balancing the burden on interstate commerce with legitimate state interests, automatically precludes the application of state antitrust laws to the business of baseball.

an exemption from investigation. Rather, law *external* to federal antitrust doctrine precludes the Attorney General's investigation. Since the Attorney General could not possibly bring a suit on the grounds that contraction constitutes anticompetitive behavior in violation of federal or state antitrust laws, any investigation must be premised on the notion that the Attorney General is free to investigate perfectly legal activity. The plaintiffs allege that this premise is incorrect in light of Florida law[13] and the Fourth Amendment,[14] which prohibit baseless "fishing expeditions."

Invoking both theories, the plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983,[15] in addition to an order setting aside the CIDs pursuant to Fla. Stat. § 542.28(3). The district court could have properly exercised federal question jurisdiction[16] over the section 1983 claims, and it could have exercised its supplemental jurisdiction[17] over the claims arising under Florida law.

---

[13]See note 5, supra.

[14]The Fourth Amendment, which protects against unreasonable searches and seizures, has been held to limit the scope of administrative subpoenas. See Okla. Press Publ'g Co. v. Walling, 327 U.S. 186, 208-11, 66 S. Ct. 494, 505-07, 90 L. Ed. 614 (1946). See also Fed. Trade Comm'n v. Am. Tobacco Co., 264 U.S. 298, 306, 44 S. Ct. 336, 337, 68 L. Ed. 696 (1924) ("It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up.").

[15]Section 1983 provides that "[e]very person who, under color of [state law] subjects . . . any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

[16]See 28 U.S.C. § 1331.

[17]See 28 U.S.C. § 1367.

9

The district court granted much of the requested relief, holding that the antitrust exemption covers the business of baseball and that state antitrust laws do not apply to the proposed contraction. The district court further held that "the Attorney General had no authority to issue antitrust CIDs to investigate the proposed contraction of Major League Baseball." Major League Baseball, 181 F. Supp. 2d at 1335. The legal basis for the latter conclusion is unclear, because no authority was cited by the district court. However, we have two clues that lead us to suspect that the court adopted the penumbra theory. First, the court's final order completely ignored the plaintiffs' claims based on Fla. Stat. § 542.28(3) and made no mention of the Fourth Amendment. Second, the final order declared that "the federal and state antitrust laws do not apply to the proposed contraction of Major League Baseball from 30 to 28 and do not authorize investigation of that proposed contraction by the Attorney General." That is, the district court appears to have believed that the right to be exempt from an antitrust investigation inherently flows from the exemption itself.

As we discuss below, we believe that the district court made an analytical mistake and that the court should have considered the plaintiffs' claims based upon the Fourth Amendment and Fla. Stat. § 542.28(3). But the court's instincts were correct: the law prohibits baseless "fishing expeditions," and so an exemption from

10

prosecution necessarily would have required the district court to prohibit the Attorney General's investigation. We therefore affirm the court's judgment in favor of the plaintiffs.

## C.

We ordinarily review a district court's decision to grant or deny an injunction for clear abuse of discretion. See United States v. Gilbert, 244 F.3d 888, 908 (11th Cir. 2001). Underlying questions of law, however, are reviewed *de novo*. See United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999) ("A district court by definition abuses its discretion when it makes an error of law.") (citation omitted); Manning ex rel. Manning v. School Bd. of Hillsborough County, Fla., 244 F.3d 927, 940 (11th Cir. 2001). The decisions of the district court that the Attorney General challenges in this appeal were all reached as a matter of law. Accordingly, *de novo* review is appropriate.

## II.

## A.

The "business of baseball" is exempt from the federal antitrust laws. See Fed. Baseball Club of Baltimore, Inc. v. Nat'l League of Prof'l Baseball Clubs, 259

U.S. 200, 42 S. Ct. 465, 66 L. Ed. 898 (1922); <u>Toolson v. New York Yankees, Inc.</u>, 346 U.S. 356, 74 S. Ct. 78, 98 L. Ed. 64 (1953); <u>Flood v. Kuhn</u>, 407 U.S. 258, 92 S. Ct. 2099, 32 L. Ed. 2d 728 (1972); <u>Prof'l Baseball Schools and Clubs, Inc. v. Kuhn</u>, 693 F.2d 1085 (11th Cir. 1982). The district court persuasively established this fact, and the Attorney General no longer contends that the federal exemption extends only to the player reserve system. Instead, the Attorney General argues that the exemption has limits. Specifically, the Attorney General contends that the exemption might not be triggered if the facts established by the impending investigation show that the plaintiffs engaged in non-exempt conduct.

The Attorney General's position is no doubt correct, but what conduct could possibly be non-exempt? It is true that the antitrust exemption has not been held to immunize the dealings between professional baseball clubs and third parties. This case, however, does not involve third parties. Rather, the issue of contraction concerns a matter that is central to baseball's league structure – specifically, the number of clubs that may participate in league play. We agree that the decision to contract is obviously part of the "business of baseball"; the number of clubs, and their organization into leagues for the purpose of playing scheduled games, are basic elements of the production of major league baseball games. Moreover, the number of clubs necessarily affects the number of clubs sharing in national

12

revenues. As the district court stated, "It is difficult to conceive of a decision more integral to the business of major league baseball than the number of clubs that will be allowed to compete." Major League Baseball v. Butterworth, 181 F. Supp.2d 1316, 1332 (N.D. Fla. 2001). When the applicability of baseball's exemption is so apparent, no factual development is necessary. See Prof'l Baseball Schools, 693 F.2d at 1085-86 (affirming, as a matter of law, a motion to dismiss where the dismissal was based upon an application of the exemption to antitrust challenges to a minor league franchise location system and game scheduling rules).

But what if club owners agreed not to eliminate the two clubs slated for elimination in the event that a locality chooses to subsidize a team, such as by paying for its stadium? Surely such a scheme, the Attorney General argues, is not covered by the exemption. We disagree. Nobody disputes the notion that money is at the core of the contraction issue. While the most die-hard baseball fans might fancy the sport as a mere pastime, most people understand that professional sports is big business and that profits matter most. So it would not be surprising if unprofitable baseball clubs were permitted to remain in otherwise unattractive markets in the event of a public bail-out. But this does not mean that a decision regarding the number of teams that may participate in league play is somehow unrelated to the "business of baseball." Federal antitrust law exempts the

13

contraction issue from judicial scrutiny, and no inquiry into MLB's motives or desires could possibly change the fact that contraction implicates the heart of the "business of baseball."[18]

B.

The Attorney General of Florida next contends that even if the business of baseball is immunized from federal antitrust prosecution, state enforcement agencies can still invoke *state* antitrust law. The argument is that the federal exemption is not really an "exemption" as such, but merely a realm where the *federal* antitrust laws do not operate. The federal exemption, the Attorney General says, is merely a "gap in, rather than an exemption to, federal antitrust law." What is meant by this crafty wording is not entirely clear, but we get the drift: the business of baseball should be viewed as an area in which Congress has refrained from federal antitrust regulation, and therefore states should have free reign to apply their antitrust laws so long as states are mindful of the Commerce Clause balancing test enunciated in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.

---

[18]The Attorney General contends that the investigation was "by no means limited to the mere act of contraction itself"; rather, the CIDs "requested information *relating to* the proposed contraction." We are unimpressed by this word game. No matter how the Attorney General characterizes the investigation, the CIDs were focused on contraction – a matter that is well within the business-of-baseball exemption.

Ct. 844, 847, 25 L. Ed. 2d 174 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.") (citations omitted). The Attorney General argues that the Pike balancing test can be applied only after an investigation is completed and a more developed record emerges.

The plaintiffs respond by arguing that Flood, in conjunction with the Supremacy Clause, makes the business of baseball immune from inconsistent state laws. Moreover, the plaintiffs contend that the Supreme Court's Commerce Clause jurisprudence, when applied to professional baseball, must be read to establish a unique *per se* rule that prohibits the application of state antitrust laws when the federal exemption is triggered. Since balancing is unnecessary, a developed record is also unnecessary.

Any discussion of whether Congress meant to immunize the business of baseball from *all* antitrust law (as opposed to *federal* antitrust law) is, of course, fanciful because Congress never conveyed its preference one way or the other. The exemption is entirely judge-made, although some decisions have attempted to

15

cloak this disturbing fact in the language of Congressional intent. Our analysis must turn to the critical language utilized by the Supreme Court in Flood:

> The petitioner's argument as to the application of state antitrust laws deserves a word. [The district court] rejected the state law claims because state antitrust regulation would conflict with federal policy and because national "uniformity (is required) in any regulation of baseball and its reserve system." The Court of Appeals, in affirming, stated, "[A]s the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law." As applied to organized baseball, and in the light of this Court's observations and holding in Federal Baseball, in Toolson, in Shubert, in International Boxing, and in Radovich, and despite baseball's allegedly inconsistent position taken in the past with respect to the application of state law, these statements adequately dispose of the state law claims.

Flood, 407 U.S. at 284-85, 92 S. Ct. at 2113 (citations omitted).

Hardly a model of clarity, the passage forces the reader to ask two questions. First, was this passage a holding? We answer in the affirmative, even though the declaration that "these statements adequately dispose of the state law claims" is far from the forceful language characteristic of most holdings. The context of the opinion makes clear that the Court was rendering a decision with respect to an important issue in the case. Indeed, the very next sentence after the quoted passage states: "The conclusion we have reached makes it unnecessary for us to consider the respondents' additional argument . . . ." Id. at 285, 92 S. Ct. at 2113.

16

Second, what were the Court's grounds for precluding the application of state antitrust law?  A careful reading of the passage yields *two* different theories. The district court, as characterized by the Supreme Court, held that federal policy exempts the business of baseball from antitrust scrutiny, and that state antitrust regulation inherently conflicts with this policy.  That is, the district court advanced a preemption theory.  The district court's holding is in considerable tension with the usual standard for preemption – a federalism-based doctrine that requires courts to "assum[e] that the historic police powers of the States [are] not to be superseded by . . . [federal laws] unless that [is] the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447 (1947).  After all, the exemption is entirely judge-made, so one would be hard-pressed to find a clear statement from Congress in favor of preemption.  Even so, the Supreme Court endorsed the district court's statement, and we are bound by the Court's holding.[19]

The Second Circuit Court of Appeals, by contrast, relied upon the Commerce Clause.  There is an interesting question as to whether Commerce

---

[19]At least one other court has similarly concluded that federal antitrust policy, as established in the Flood decision, precludes the application of state antitrust law to the business of baseball.  See In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599, 611 (7th Cir. 1997) ("Antitrust law, for example, *with an isolation exception, Flood v. Kuhn* . . . is a field in which Congress has *not* sought to replace state with federal law.") (first emphasis added; citations omitted).

Clause doctrine, when applied to the business of baseball, precludes the application of state antitrust law *per se*, or whether the traditional Pike balancing test must be invoked on a case-by-case basis. The plaintiffs argue that some courts have erected a *per se* rule, even though the Second Circuit decision endorsed by the Flood Court employed the Pike balancing test. Fortunately, we need not answer this question because our Supremacy Clause analysis disposes of the question at hand: federal law establishes a universal exemption in the name of uniformity.[20]

C.

So far, we have established two key points. First, contraction is an issue that is at the heart of the "business of baseball"; therefore, contraction cannot be the subject of an antitrust enforcement action predicated upon federal law. Second, the plaintiffs are also immune from state antitrust laws by virtue of the Supremacy Clause. Confronted with these two legal conclusions, the Attorney General responds by arguing that even if federal law precludes an antitrust *prosecution*, this

---

[20]Notably, a Florida statute provides that Florida antitrust law does not apply to conduct exempted from federal antitrust law. See Fla. Stat. § 542.20. It is perhaps misleading to say that Florida law is "preempted" by federal law when both laws should be read coterminously. However, federal courts may not enjoin state actors to comply with state law, see Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S. Ct. 900, 911, 79 L. Ed. 2d 67 (1984), and so the district court wisely declined to base its decision on Fla. Stat. § 542.20.

18

does not mean that a mere *investigation* cannot be conducted. We agree, but our agreement with the Attorney General on this point does not end the matter.

1.

First, it is far from axiomatic that exemptions from prosecution necessarily entail a concomitant right to be free from investigation. The Second Circuit, for example, held that a company could not invoke the Noerr-Pennington antitrust exemption[21] as a basis for withholding materials sought through a CID issued by the U.S. Department of Justice. See Associated Container Transp. (Aus.) Ltd. v. United States, 705 F.2d 53, 59 (2d Cir. 1983). The court emphasized that there is a distinction between a prosecution, from which a business could be protected by the judge-made antitrust exemption, and a mere investigation into corporate conduct:

> [T]he appellees are not resisting formal antitrust charges and cannot, therefore, simply rely on a doctrine which protects *from prosecution* businesses seeking to influence the enforcement of laws. To prevail on this appeal, appellees must demonstrate not that their conduct may be immune from prosecution, but rather that their communications with the Federal Maritime Commission are beyond the scope of legitimate inquiry.

---

[21]The cases of Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965), establish an exemption from antitrust liability for certain petitioning activities.

Id. In a similar vein, the Fourth Circuit held that Noerr-Pennington petitioning immunity "is by definition an exemption from antitrust liability, and not a bar to discovery of evidence." North Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 666 F.2d 50, 53 (4th Cir. 1981).

Second, antitrust exemptions must be strictly construed. See Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 421, 106 S. Ct. 1922, 1929, 90 L. Ed. 2d 413 (1986). This rule has its roots in the principle that the antitrust laws form the bedrock of our capitalist system premised upon competition, and that anticompetitive conduct harms consumer welfare. For this reason, judge-made exemptions, no less than statutory exemptions, must be closely cabined. We are hesitant to read the "business of baseball" exemption broadly – especially since the Supreme Court has called the exemption an "aberration."[22] Therefore, we reject the penumbra theory proffered by the plaintiffs and adopted by the district court.


2.

In advancing the penumbra theory, the plaintiffs point out that the business-of-baseball exemption is not riddled multiple exceptions, distinguishing it from Noerr-Pennington petitioning immunity. It makes no sense, the plaintiffs contend,

---

[22]See note 3, supra.

to allow an investigation into conduct that we know is perfectly legal before the investigation commences. We agree with this sentiment, although we find it more appropriate to locate the right to be free from baseless investigations (commonly referred to as "fishing expeditions") in other sources of law rather than the antitrust exemption itself.

The Fourth Amendment has been held to limit the scope of investigatory power exercised by federal and state agencies. In <u>See v. City of Seattle</u>, 387 U.S. 541, 544, 87 S. Ct. 1737, 1740, 18 L. Ed. 2d 943 (1967), for example, the Court described the constitutional limits on administrative subpoenas:

> It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.

<u>See also</u> <u>United States v. Morton Salt Co.</u>, 338 U.S. 632, 652-53, 70 S. Ct. 357, 368-69, 94 L. Ed. 401 (1950); <u>Fed. Trade Comm'n v. Am. Tobacco Co.</u>, 264 U.S. 298, 305-06, 44 S. Ct. 336, 337, 68 L. Ed. 696 (1924). To be sure, Congress and state legislatures may permissibly grant broad investigative authority to regulatory agencies. <u>See</u> <u>Okla. Press Publ'g Co. v. Walling</u>, 327 U.S. 186, 204-05, 66 S. Ct. 494, 503, 90 L. Ed. 614 (1946). But investigations premised solely upon *legal*

activity are the very type of "fishing expedition" that were the target of Justice Holmes's assault in American Tobacco.

Like federal constitutional law, Florida law prohibits the Attorney General from conducting baseless investigations.  See Fla. Stat. § 542.28(3); cf. Check 'N Go of Florida, Inc. v. Florida, 790 So. 2d 454, 457-58 (Fla. Dist. Ct. App. 2001) ("The level of proof required of the investigative agency must suggest something more than a fishing expedition, and something less than probable cause."). Section 542.28 establishes two standards that CIDs must meet.  First, CIDs must be set aside if they fail to meet the "standards applicable to subpoenas or subpoenas duces tecum issued by a court of [Florida] in aid of a grand jury investigation." Fla. Stat. § 542.28(3)(a).  Second, CIDs must be set aside if they fail to meet the "standards applicable to a discovery request under the Florida Rules of Civil Procedure, to the extent that the application of such standards to any such demand is appropriate and consistent with the provisions and purposes of this chapter." Fla. Stat. § 542.28(3)(b).  It is clear that under either standard, the Attorney General must have more than a mere intuition that illegal activity is afoot.[23]  This

_____

[23]The Attorney General's brief reveals his broad (and incorrect) view of the investigatory discretion vested in his Office: "Enjoining the Attorney General's civil investigation at the outset is foreclosed by the possibility that investigation of the events surrounding the proposed contraction would have revealed antitrust activity involving non-baseball entities that could not properly hide behind baseball's Federal Baseball immunity.  Such persons would not be permitted to evade the antitrust laws, and yet without any investigation, their existence will never be known." See Brief of Atty. Gen. at 19.  In other words, the Attorney General has no

22

position is further advanced by the language of Fla. Stat. § 542.27(3), which requires that the Attorney General "suspect" that a violation has taken place before an investigation may commence, and Flat Stat. § 542.28(1), which requires that the Attorney General have "reason to believe" that a person "may be in possession . . . of any documentary material" that is "relevant to a civil antitrust investigation" prior to the issuance of any CIDs. In short, it is clear that an investigation predicated solely upon legal activity does not pass muster under *any* standard.

### III.

The death of the business-of-baseball exemption would likely be met with considerable fanfare, save for the club owners who benefit from the rule. The exemption was founded upon a dubious premise,[24] and it has been upheld in subsequent cases because of an equally dubious premise.[25] Moreover, the welfare

---

idea what illegal conduct might have occurred, or who might have engaged in this conduct. Even so, the Attorney General believes he has the power to commence a full-blown investigation. Although the Attorney General need not have absolute proof of a violation prior to commencing an investigation (otherwise, what would be the point of conducting an investigation in the first place?), Florida law and the Constitution clearly require that the Attorney General have *something*.

[24]Federal Baseball, which was typical of the Supreme Court's cramped Commerce Clause jurisprudence during the pre-New Deal era, held that "[t]he business [of] giving exhibitions of baseball" is a "purely state affai[r]." Federal Baseball, 259 U.S. at 208, 42 S. Ct. at 466. The result of this conclusion was that the Sherman Act did not apply to Major League Baseball.

[25]In Toolson, the Court retreated from its cramped view of interstate commerce and instead rested its decision on what it perceived as congressional intent. See Toolson, 346 U.S. at

23

losses stemming from the potentially anticompetitive agreements among

professional sports clubs have been well documented. See, e.g., Stephen F. Ross,

Antitrust Options to Redress Anticompetitive Restraints and Monopolistic

Practices by Professional Sports Leagues, 52 Case W. Res. L. Rev. 133 (2001).

Finally, antitrust law has significantly changed since Federal Baseball was decided;

*per se* rules have often been jettisoned in favor of the "rule of reason" – a

---

357, 92 S. Ct. at 78-79.  This was another shaky holding, because the Court usually declines to infer an intention of Congress merely because of congressional inaction.  In Helvering v. Hallock, 309 U.S. 106, 119-21, 60 S. Ct. 444, 451-52, 84 L. Ed. 604 (1940), for example, the Court said:

> Nor does want of specific Congressional repudiations . . . serve as an implied instruction by Congress to us not to reconsider, in the light of new experience, . . . those decisions . . . .  It would require very persuasive circumstances enveloping Congressional silence to debar this Court from re-examining its own doctrines . . . .  Various considerations of parliamentary tactics and strategy might be suggested as reasons for the inaction of . . . Congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.

One might also question the propriety of basing a rule of law on a perceived intention alone, without any textual hook whatsoever.  To be sure, the antitrust laws, which have been read as a delegation to the courts to craft the law of competition in the common law tradition, might present a unique case where the Court's judge-made exemption is more palatable; however, one must wonder why the Court was so intent on casting the baseball exemption as a rule ordained by Congress in the first place.

Responding to criticisms that the Court's jurisprudence has been schizophrenic in granting an exemption to baseball but not to other professional sports, the Court's analysis in Flood boiled down to this puzzling language: "If we were to act otherwise, we would be withdrawing from the conclusion as to congressional intent made in Toolson and from the concerns as to retrospectivity therein expressed.  Under these circumstances, there is merit in consistency even though some might claim that beneath that consistency is a layer of inconsistency." Flood, 407 U.S. at 284, 92 S. Ct. at 2113.  So the reasoning behind the present rule seems to be a rigid notion of stare decisis, coupled with a hesitancy to render a decision that would operate prospectively only.

balancing exercise that would uphold conduct that, while appearing anticompetitive at first blush, proves to be essential for maintaining a successful league-based enterprise. In this vein, we do not fault the position taken by some courts, and the arguments proffered by the Attorney General, that the exemption should be extremely narrow. Even so, we believe that a good faith reading of Supreme Court precedent leaves us no choice but to reach the following conclusions: First, contraction is a matter that falls within the "business of baseball" and therefore cannot be the subject of a prosecution based upon federal antitrust law. Second, when the business-of-baseball exemption is triggered, baseball clubs are equally immune from prosecution under state antitrust law. Finally, because the act of contraction (or an agreement to contract) cannot possibly violate state or federal antitrust laws, an investigation based solely upon contraction is baseless and therefore violates the Fourth Amendment and Florida law – both of which limit the scope of the Attorney General's authority to issue investigative subpoenas. It is up to the Supreme Court or Congress to overrule Flood outright, or perhaps devise a more cabined exemption. As an intermediate appellate court, we have no choice but to hold that the district court was correct in granting judgment in favor of the plaintiffs.

AFFIRMED.